In re MOBILEMEDIA SECURITIES LITIGATION.

No. CIV. A. 96–5723 (AJL).

United States District Court, D. New Jersey.

Oct. 21, 1998.

902

Milberg Weiss Bershad Hynes & Lerach, Deborah Clark–Weintraub, William C. Fredericks, New York, NY, Lead Counsel for the Secondary Offering Plaintiffs.

Cohn Lifland Pearlman Herrmann & Knopf, Peter S. Pearlman, Saddle Brook, John A. Maher, Summit, Liaison Counsel For The Section 10(b) Plaintiffs.

Lowey Dannenberg Bemporad & Selinger, Neil L. Selinger, William J. Ban, White Plains, NY, Wolf Haldenstein Adler Freeman & Herz, Daniel W. Krasner, Peter C. Harrar, New York, NY, Co–Lead Counsel for the Section 10(b) Plaintiffs.

Latham & Watkins, Michael Chertoff, Newark, NJ, for Defendants David Bayer, Santo Pittsman, Kenneth Mitchell, and Clifford Bean.

Kevin H. Marino, Newark, NJ, Richards Spears Kibb & Orbe, New York, NY, for Defendants Gregory Rorke and John Kealey.

Sills Cummis Zuckerman Radin Tischman Epstein & Gross, Jeffrey J. Greenbaum, Newark, NJ, Simpson Thacher & Bartlett, New York, NY, for the Underwriter Defendants.

Gibbons, Del Deo, Dolan, Griffinger & Vecchione, David Fernandez, Newark, NJ, Wachtell Lipton Rosen & Katz, New York, NY, for Defendants Mitchell Cohen, John Bunce and Tully Friedman.

Bressler Amery & Ross, Dominick Evangelista, Florham Park, NJ, Brobeck Phleger & Harrison, San Francisco, CA, for Defendant Kenneth McVay.

## OPINION

LECHNER, District Judge.

This is a consolidated class action[1] brought on behalf of all purchasers of Class A common stock of MobileMedia Corporation ("MobileMedia") ("MobileMedia Stock") during the period running from 29 June 1995 to 27 September 1996 ("the Class Period") (the "Section 10(b) Class") and all purchasers of Mobile Media Stock or 9–3/8% Senior Subordinated Notes due in the year 2007 (the "Notes") issued in an offering (the "Secondary Offering") pursuant to a prospectus (the "Secondary Offering Prospectus") and registration statement (the "Secondary Offering Registration Statement"), dated 7 November 1995, (the "Secondary Offering Class").

The consolidated amended complaint (the "Amended Complaint") alleges violations of section 11 ("Section 11"), as amended 15 U.S.C. § 77k, section 12(a)(2) ("Section 12(a)(2)"), as amended 15 U.S.C. § 77l(2), section 15 ("Section 15"), as amended 15 U.S.C. § 77o, of the Securities Act of 1933 (the "Securities Act"). *See* Amended Complaint at ¶¶ 117–143, Counts 1–3. The Amended Complaint further alleges violations of section 10(b) ("Section 10(b)"), as amended 15 U.S.C. § 78j(b), and section 20 ("Section 20"), as amended 15 U.S.C. § 78t, of the Securities Exchange Act of 1934 (the "Exchange Act") and Rule 10b–5 ("Rule 10b–5") of the Securities and Exchange Commission ("SEC"), 17 C.F.R. § 240.10b–5. *See* Amended Complaint at ¶¶ 144–163, Counts 4–5.

Federal question jurisdiction pursuant to 28 U.S.C. §§ 1331, 1337 is alleged based upon Section 22 of the Securities Act, as amended 15 U.S.C. § 77v, and Section 27 of

---

1. Plaintiffs seek to represent a class of securities purchasers. The class, however, has not been certified.

 This matter was originally assigned to the Honorable John W. Bissell, U.S.D.J. Plaintiffs, as defined below, were appointed lead plaintiffs by Order of Judge Bissell, dated 31 March 1997. This matter was assigned to the undersigned on 6 October 1997.

the Exchange Act, as amended 15 U.S.C. § 78aa. *See* Amended Complaint at ¶ 14.

Presently pending is the Defendants'[2] motion to dismiss the Amended Complaint for failure to state a claim (the "Motion to Dismiss")[3] pursuant to Rule 12(b)(6) of the Federal Rules of Civil Procedure.[4] For the reasons set forth below the Motion to Dismiss is granted as to the allegations contained in paragraphs 54 and 90 to 92 of the Amended Complaint. In all other respects, the Motion to Dismiss is denied.

*Facts*[5]

A. *The Parties*

1. *MobileMedia (no longer named as a party)*

MobileMedia is a Delaware corporation with its principal offices and corporate headquarters in Ridgefield Park, New Jersey. *See* Amended Complaint at ¶ 19(b). MobileMedia was incorporated in September 1993 to acquire the paging business of Metromedia Telecommunications, Inc. *See id.* at ¶ 19(c). MobileMedia became a public company on 29 June 1995 in an initial public offering of more than eight and three-quarters million shares of MobileMedia Stock (the "IPO")[6]. *See id.* In August 1995, MobileMedia acquired Dial Page, Inc. ("Dial Page"), a regional paging company operating primarily in the southeastern United States. *See id.* at ¶ 19(e). In September 1995, Mobile acquired Mobile Communications Corporation of America ("MobileComm"), a subsidiary of BellSouth. *See id.*

MobileMedia is not named as a defendant in this matter because litigation concerning MobileMedia was stayed following the filing of a petition for bankruptcy by MobileMedia on 30 January 1997. *See* Amended Complaint at ¶ 19(a).

As of 15 March 1996, there were approximately forty-five million shares of MobileMedia stock outstanding. *See* Amended Complaint at ¶ 29. These shares were held by 222 record owners on behalf of thousands of beneficial owners throughout the United States. *See id.* In addition, 15,525,000 shares of MobileMedia Stock and $250 million of MobileMedia Notes were sold in the Secondary Offering. *See id.*

2. *The Rule 10b–5 Class*

During the Class period, the following purchased shares of MobileMedia Stock in the open Market:

(1) Consolidated Memorandum of Law in Opposition to Defendants' Motion to Dismiss the Consolidated Amended Complaint (the "Opposition Brief");

(2) Affidavit of William J. Ban in Opposition to Defendants' Motion to Dismiss the Amended Consolidated Complaint (the "Ban Aff."); and

(3) Plaintiffs' Appendix of Authorities.

---

**2.** The "Defendants" refers, collectively, to the named defendants. The Defendants are defined in greater detail below.

**3.** Before filing the Motion to Dismiss, the Defendants provided Plaintiffs with notice of purported deficiencies in the pleadings. *See* 10 November 1997 Letter. Plaintiffs were afforded an opportunity amend their consolidated complaint, *see* Trans. of 3 November 1997 Proceedings at 12–13, and the Amended Complaint was filed on 24 November 1997. Plaintiffs were advised no further leave to amend would be granted. *See id.*

**4.** In support of the Motion to Dismiss, Defendants Submitted:

(1) Memorandum of Law in Support of Defendants' Motion to Dismiss the Amended Consolidated Complaint (the "Moving Brief");

(2) Defendants' Reply Memorandum of Law in Support of Their Motion Dismiss the Amended Consolidated Complaint (the "Reply Brief") with attached exhibit;

(3) Affidavit of Geoffrey S. Berman (the "Berman Aff.") with attached exhibits;

In opposition to the Motion to Dismiss, Plaintiffs submitted:

**5.** Each of the allegations in the Amended Complaint must be accepted as true in determining the Motion to Dismiss and all reasonable inferences must be drawn in favor of the Plaintiffs. *See Hayes v. Community Gen. Osteopathic Hosp.,* 940 F.2d 54, 56 (3d Cir.1991), *cert. denied,* 502 U.S. 1060, 112 S.Ct. 940, 117 L.Ed.2d 110 (1992); *Institute for Scientific Information, Inc. v. Gordon and Breach, Science Publishers, Inc.,* 931 F.2d 1002, 1004 (3d Cir.), *cert. denied,* 502 U.S. 909, 112 S.Ct. 302, 116 L.Ed.2d 245 (1991) (citing *Society Hill Civics Ass'n v. Harris,* 632 F.2d 1045, 1058 (3d Cir.1980)).

**6.** MobileMedia Stock was traded on the NASDAQ stock market under the symbol MBLM. *See* Amended Complaint at ¶ 19(f). After MobileMedia filed for bankruptcy, the MobileMedia Stock was traded under the symbol MBLMQ. *See id.*

| Plaintiff | Purchase Date | Price | No. Shares |
|---|---|---|---|
| Norman Bobrow | 23 August 1995 | $24.50 | 700 |
| Dr. David Kirschner | 8 November 1995 | 24.50 | 500 |
| Defined Benefit | 9 January 1996 | 21.87 | 500 |
| Pension Plan & Trust | 7 June 1996 | 14.625 | 1000 |
| | 12 August 1996 | 9.025 | 2000 |
| Lawrence Robbins | 11 December 1995 | 26.00 | 1000 |
| | 10 January 1996 | 21.125 | 500 |
| Sidney Isaacs | 3 April 1996 | 20.375 | 1000 |
| | 12 July 1996 | 20.00 | 2000 |
| Lenore Isaacs | 11 June 1996 | 14.875 | 2000 |
| | 13 June 1996 | 13.375 | 2000 |
| Samuel Tave | 13 June 1996 | 13.375 | 3000 |
| Jackson Hawkins | 27 August 1996 | 6.87 | 200 |
| Vincent Romei | 18 January | 21.25 | 1000 |

*See* Amended Complaint at ¶ 17. These Plaintiffs (the "Section 10(b) Plaintiffs") seek to represent the Section 10(b) Class and bring Counts IV and V of this action. *See id.* at ¶ 28(a). The Section 10(b) Plaintiffs and the members of the Section 10(b) Class allege they relied upon materially false and misleading reports, press releases and public statements made by MobileMedia and were damaged as a result. *See id.* at ¶ 17(b).

### 3. *The Secondary Offering Class*

The following Plaintiffs purchased MobileMedia Stock [7] in the Secondary Offering (the "Secondary Offering Plaintiffs"):

| Plaintiff | Date of Purchase | Price | No. Shares |
|---|---|---|---|
| Howard Fienman DDS PA Pension Plan Trust | 7 November 1995 | $23.75 | 300 |
| Vincent Romei | 7 November 1995 | 23.75 | 2000 |

*See* Amended Complaint at ¶ 18(a). These Plaintiffs (the "Secondary Offering Plaintiffs") seek to represent the Secondary Offering Class and bring Counts I, II and III of this action. *See id.* at ¶ 18(b).

7. By letter, dated 22 April 1998 (the "22 April 1998 Letter"), Defendants challenged the standing of stock purchasers to bring Section 11 and Section 12(a)(2) claims on behalf of the purchasers of MobileMedia Notes. *See* 22 April 1998 Letter (citing *In re Paracelsus Corp. Sec. Litig.,* 6 F.Supp.2d 626, 632 (D.Tex.1998) (dismissing claims relating to notes offering when named plaintiffs had only purchased stock)). Defendants argue only that Plaintiffs do not have standing to bring claims on behalf of the purchasers of MobileMedia Notes. Defendants do not argue Plaintiffs lack standing to bring Section 11 and Section 12(a)(2) related to their purchases of MobileMedia Stock. *See* 22 April 1998 Letter

"That a suit may be a class action adds nothing to the question of standing, for even named plaintiffs who represent a class must allege and show that they personally have been injured." *Lewis v. Casey,* 518 U.S. 343, 357, 116 S.Ct. 2174, 135 L.Ed.2d 606 (1996). In the instant matter, Plaintiffs have alleged an injury traceable to the Secondary Offering—the same offering in which the Notes were issued. *See* Amended Complaint at ¶¶ 126–27, 134. Courts have allowed those with valid securities claims to represent the interests of the purchasers of other types of securities in class action suits. *See Endo v. Albertine,* 147 F.R.D. 164, 167 (N.D.Ill.1993); *Epstein v. Moore,* Fed.Sec.L.Rep. (CCH) ¶ 93,957 at 90,443 (D.N.J. 3 June 1984) (Thompson, J.); *In re Saxon Sec. Litig.,* Fed.Sec.L.Rep. (CCH) ¶ 99,691 at 99,779 (S.D.N.Y. 23 February 1984). Given Plaintiffs have sufficiently alleged individual cognizable injuries pursuant to Section 11 and Section 12(a)(2), Plaintiffs have standing to bring these claims. Concerns over whether stock purchasers should represent notes purchasers are better addressed at the time of class certification. *See* Fed.R.Civ.P. 23(a) (requiring named plaintiffs to adequately represent the class and to have claims which are common to, and typical of, the class).

#### 4. *The Officer and/or Director Defendants*

Gregory M. Rorke ("Rorke") was Chief Executive Officer of Mobile Media from October 1994 to approximately 27 September 1996, when he resigned. *See* Amended Complaint at ¶ 20. Rorke was a director of MobileMedia from May 1995 until shortly after his resignation as CEO in September 1996. *See id.* Rorke signed the IPO and Secondary Offering Registration Statements and the SEC Form 10–k for the fiscal year ended 31 December 1995 (the "1995 Form 10–k") filed with the SEC 1 April 1996. *See id.*

John M. Kealey ("Kealey") was President of MobileMedia from October 1994 to 15 September 1996, when he resigned. *See* Amended Complaint at ¶ 21. Kealey was a director of MobileMedia, and President and Chief Operating Officer of a MobileMedia subsidiary, from December 1993 until his resignation as President in September 1996. *See* Amended Complaint at ¶ 21. Kealey signed the IPO and Secondary Offering Registration Statements and the 1995 Form 10–K. *See id.*

David A. Bayer ("Bayer") has been a director of MobileMedia since February 1994. Bayer was named Chairman of the Board of Directors on 15 July 1996. *See* Amended Complaint at ¶ 22. From 15 July 1996 to 3 September 1996, Bayer also served as interim CEO of MobileMedia. *See id.* Bayer signed the IPO and Secondary Offering Registration Statements and the 1995 Form 10–K. *See id.*

Santo J. Pittsman ("Pittsman")[8] was the Vice President and Chief Financial Officer of MobileMedia during all periods relevant to the instant action. *See* Amended Complaint at ¶ 23. Pittsman signed the IPO and Secondary Offering Registration Statements and the 1995 form 10–K. *See id.*

Kenneth R. McVay ("McVay")[9] was the Secretary and Senior Vice President and General Counsel of MobileMedia at all relevant times. *See* Amended Complaint at ¶ 24. McVay signed amendments to the annual reports of MobileMedia on SEC Forms 8–K ("Form 8–K"), including a Form 8–K filed on 19 July 1996 (the "1996 Form 8–K"). *See id.* McVay is also alleged to have authorized the signing of various certifications and representations concerning the compliance by MobileMedia with the Federal Communications Commission (the "FCC") rules and regulations, including certifications and representations required by the FCC and the creditors of MobileMedia. *See id.*

Defendants Rorke, Kealey, McVay, and Bayer, by reason of their "direct and substantial management position and responsibilities during the time relevant to [the Amended Complaint]," are alleged to be controlling persons within the meaning of Section 20 of the Exchange Act and section 15 of the Securities Act. *See* Amended Complaint at ¶ 25.

#### 5. *The Outside Director Defendants*

Clifford A. Bean, John L. Bunce ("Bunce"), Jr., Mitchell R. Cohen ("Cohen"), Tully M. Friedman ("Friedman") and Kenneth P. Mitchell (collectively, the "Outside Director Defendants") were, at all relevant times, directors of MobileMedia. *See* Amended Complaint at ¶ 26. The Outside Director Defendants, either individually or through an attorney, signed the IPO and Secondary Offering Registration Statements. *See id.* Bunce, Cohen and Friedman are also alleged to be controlling persons within the meaning of Section 15 of the Securities Act. *See id.* They are general partners in Hellman & Friedman Capital Partners II, L.P., H & F Orchard Partners, L.P., H & F International Partners, L.P., and H & F MobileMedia Partners, partnerships that, after the Secondary Offering, controlled 57.2 percent of the aggregate voting power of all MobileMedia Stock. *See id.* All of the Outside Directors are named as Defendants in Counts I–II. *See id.* Bunce, Cohen and Friedman are named as defendants in Count III as well. *See id.*

#### 6. *The Underwriter Defendants*

Lehman Brothers, Goldman, Sachs & Co., Donaldson Lufkin, & Jenrette Securities

---

8. Pittsman is named as a defendant in Counts I–III only.

9. McVay is named as a defendant only in Counts IV–V of this action.

Corporation and Smith Barney Inc. (collectively, the "Underwriter Defendants") are named as defendants in this action because of their involvement in the Secondary Offering. *See* Amended Complaint at ¶ 27. The Underwriter Defendants were the lead underwriters in the Secondary Offering. *See id.*

### B. *Procedural History*

The current action is a consolidation of numerous actions filed in the New Jersey district courts. The Plaintiffs filed the Amended Complaint on 24 November 1997. Answers were filed by the Defendants on 19 December 1997.

### C. *Background*

Plaintiffs allege that defendants violated the Securities Act, as amended 15 U.S.C. § 77a *et seq.*, and/or the Exchange Act, as amended 15 U.S.C. § 78a *et seq.* by failing to disclose (1) certain integration problems that MobileMedia allegedly had following its acquisitions of Dial Page and MobileComm and (2) certain false filings submitted to the FCC.

MobileMedia provides local, regional and national paging services to approximately four and one-half million subscribers. *See* Amended Complaint at ¶ 36. The paging operations of MobileMedia are subject to regulation by the FCC. *See id.* at ¶ 38. For example, MobileMedia must obtain licenses from the FCC for the use of radio frequencies necessary to conduct its business. *See id.* In addition to the FCC licenses, the paging business of MobileMedia also required the creation of a network of transmitters. *See id.* at ¶ 39. The transmitter network was needed to send the radio signals to the pagers from a central control unit. *See id.*

In the first quarter of 1995, the FCC authorized MobileMedia to construct in excess of 300 transmitter stations. *See* Amended Complaint at ¶ 40. The FCC required these stations be constructed and placed into service within one year or the authorization would be forfeited. *See id.*

Section 22.142 of the FCC Rules mandates notification to the FCC by the filing of FCC Form 489 ("Form 489") when a paging station is completed and placed into service. *See id.* at ¶ 41. This notice must be filed no later than fifteen days after the station has been placed into service. *See id.* If a licensee fails to complete construction and place a station into service before the one year deadline, then the FCC authorization automatically terminates. *See id.*

### 1. *The Allegedly False and Misleading IPO Registration Statement and Prospectus*

MobileMedia became a public company on June 29, 1995 in an initial public offering conducted pursuant to a registration statement (the "IPO Registration Statement") and prospectus (the "IPO Prospectus") filed with the SEC. *See* Amended Complaint at ¶ 42. in the IPO, MobileMedia sold 8,640,000 shares of stock at $18.50 per share. *See id.* These funds were raised to enable MobileMedia to purchase Dial Page. *See id.*

Approval of the FCC was required for the acquisition of Dial Page by MobileMedia. *See* at ¶ 43. A prerequisite for such approval was compliance with FCC rules and regulations. *See id.* Addressing this subject, the IPO Registration Statement stated:

The FCC licenses granted to [MobileMedia] are for varying terms of up to 10 years, at the end of which renewal applications must be approved by the FCC. In the past, *paging license renewal applications generally have been granted by the FCC in most cases upon a demonstration of compliance with FCC regulations and adequate service to the public.... The FCC has granted each renewal license for which [MobileMedia] has filed.*

*Although [MobileMedia] is unaware of any circumstances which would prevent the grant of pending or future renewal applications, no assurance can be given that any of [MobileMedia's] licenses will be renewed by the FCC. Furthermore, the FCC has the authority to restrict operation of licensed facilities or revoke or modify licenses. None of [MobileMedia's] licenses has ever been revoked or modified involuntarily.*

The Communications Act requires licensees such as [MobileMedia] to obtain prior

approval from the FCC of the assignment or transfer of control of any construction permit or station license or any rights thereunder, including in the context of acquisitions of other paging companies by [MobileMedia] and transfers by [MobileMedia] of a controlling interest in any of its licenses or construction permits or any rights thereunder. Whenever FCC approval is required, any interested party may file a petition to dismiss or deny the application for renewal or approval of a proposed transfer. *The FCC has approved each acquisition and transfer of control for which [MobileMedia] has sought approval.* The Company also regularly applies for FCC authority to use additional frequencies, modify the technical parameters of existing licenses, expand its service territory and provide new services. *Although there can be no assurance that future requests for approval or applications filed by [MobileMedia] will be approved or acted upon in a timely manner by the FCC, or that the FCC will grant such requests or application, [MobileMedia] knows of no reason to believe any such requests or applications will not be granted.*

*Id.* (emphasis in Amended Complaint) (quoting MobileMedia IPO Registration Statement).

Plaintiffs allege that the IPO Registration Statement and Prospectus were materially false and misleading. Plaintiffs contend "they represented that MobileMedia was in compliance with FCC rules and regulations when, in fact, it was not." *See* Amended Complaint at ¶ 44. Plaintiffs further allege that MobileMedia engaged in a regular practice, since the inception of the company, of filing false and illegal Forms 489.[10] *See id.* These false filings are alleged to include filings submitted before 29 June 1995 for stations that either had not been constructed or for stations that had been operational for more than fifteen days. *See id.*

**2. The Allegedly False and Misleading 14 September 1995 Press Release**

Mobile Media issued a press release on 14 September 1995 (the "14 September 1995 Press Release") over the Dow Jones Newswire announcing the intention to acquire MobileComm. *See* Amended Complaint at ¶ 45. The 14 September 1995 Press Release quoted Rorke as stating:

"This acquisition represents a breakthrough in the personal communications industry.... The combined entity will have two nationwide one-way wireless networks, two nationwide narrowband two-way PCS licenses, a sales presence in 85 of the top 100 markets, an extensive retail distribution network that encompasses more than 15,000 stores and *the most efficient back-office in the industry— a great combination.*

"Our recent Dial Page acquisition along with this pending acquisition accelerates our corporate objective—: *to create the preeminent wireless messaging company by combining economies of scale in our spectrum and sales coverage along with first class customer service.*"

Amended Complaint at ¶ 45 (emphasis in Amended Complaint) (citing 14 September 1995 Press Release).

The 14 September 1995 Press Release is alleged to be materially false and misleading because it "boasted of the apparently seamless synergies and economies of scale of integrating MobileComm into MobileMedia." *See* Amended Complaint at ¶ 46. Plaintiffs allege the retail market of MobileMedia was fundamentally different from the business-customer focus of MobileComm. *See id.* These differences are alleged to have prevented the realization of any economies of scale. *See id.* Plaintiffs further allege MobileMedia admitted it was experiencing difficulty integrating Dial Page, a smaller company than MobileComm, at the time of the 14 September 1995 Press Release. *See id.*

---

**10.** These filings are alleged to be false and illegal because they represented that unconstructed stations were in fact constructed and operational.

**3.** *Alleged Problems Tracking License Authorizations and Construction Status.*

Belardi, at all relevant times, was Regulatory Counsel for Mobile Media.[11] *See* Amended Complaint at ¶ 47. Under the supervision of McVay, Belardi was responsible for tracking the station applications, authorizations and construction status to ensure MobileMedia made appropriate filings with the FCC. *See id.*

Plaintiffs allege, beginning in the third quarter of 1993, Belardi knowingly filed false Forms 489 with the FCC. *See* Amended Complaint at ¶ 49. Plaintiffs further allege that forty-nine of the two hundred forty-five Forms 489 filed with the FCC between 11 October 1993 and 31 December 1995 were false. *See id.*

Belardi had created a tracking system so he would know when Forms 489 needed to be filed with the FCC. *See* Amended Complaint at ¶¶ 48–49. Plaintiffs allege in the Fall of 1995, this tracking system began to fail because of difficulties MobileMedia was experiencing integrating Dial Page and MobileComm. *See id.*

**4.** *The Allegedly False and Misleading Secondary Offering Registration Statement and Prospectus*

On 7 November 1995, the Secondary Offering Registration Statement was declared effective by the SEC. *See* Amended Complaint at ¶ 52. Pursuant to this registration statement, MobileMedia, through the Underwriter Defendants, sold 15,525,000 of stock. *See id.* The proceeds of this offering totaled $368,718,750. *See id.*

Concurrent with the Secondary Offering of MobileMedia Stock, MobileMedia Communications, Inc., the principal operating subsidiary of MobileMedia, offered notes to the public. *See id.* The proceeds from the Notes totaled $250 million.

Plaintiffs allege the Secondary Offering Registration Statement and Prospectus portrayed MobileMedia as a rapidly expanding paging company with a strategy for sustaining and increasing profitability. *See* Amended Complaint at ¶ 53. Plaintiffs further allege the Secondary Offering Registration Statement and Prospectus described MobileMedia as "well positioned to thrive and prosper because of its resources." *See id.* at ¶ 54.

The Secondary Offering Prospectus stated: Management believes that future success in these markets will depend upon satisfying business and individual consumers' demand for advanced personal messaging, wireless data applications and next-generation two-way narrowband PCS at competitive rates. *[MobileMedia] believes to meet these demands, successful wireless communications companies must have sufficient spectrum capacity, national sales coverage through multiple distribution channels and operational economies of scale. [MobileMedia] believes that it will be one of a limited number of companies that will have these resources.*

\* \* \* \* \* \*

On August 31, 1995, [MobileMedia] completed its acquisition of the paging and wireless messaging business of Dial Page for a purchase price of $188.5 million, comprising cash and the assumption of the $85.0 million aggregate principal amount of and accrued interest on the Dial Page Notes.

\* \* \* \* \* \*

[MobileMedia] builds and operates wireless messaging and communications systems, and generates revenues from the provision of paging and other wireless communications services. During 1994, [MobileMedia] made a number of key additions to its senior management team. This team has redefined [MobileMedia's] objective and operating strategy, which incorporates four initiatives: (i) Spectrum and Systems,

---

**11.** Belardi had central responsibility for ensuring compliance with the licensing requirements of the FCC. *See* Factual Report Regarding Regulatory Compliance Issues Prepared on Behalf of MobileMedia Corp., 15 October 1996 (the "15 October 1996 Report") at 9. Belardi was responsible for tracking station applications, authorizations and construction status. *See id.* Sometime in the Fall of 1995, the tracking system created by Belardi collapsed. *See id.* at 10.

(ii) Sales Force and Services, (iii) Scale Economies and (iv) Strategic Alliance. In the past year, management's initial steps to implement these initiatives have included: (i) *commencing the construction of its nationwide wireless network,* purchasing licenses for a nationwide two-way narrowband PCS wireless network and commencing the upgrade of its paging terminal infrastructure, (ii) reaching an agreement to acquire MobileComm *and completing the Dial Page Acquisition,* (iii) increasing its investment in the reseller distribution channel by nearly doubling its reseller sales force, and (iv) consolidating its customer service and credit collection centers.

Amended Complaint at ¶¶ 53–55 (emphasis in original) (citing Secondary Offering Prospectus at 4–5, 23).

Plaintiffs allege these statements in the Secondary Offering Prospectus were materially false and misleading because they failed to disclose MobileMedia was experiencing difficulties integrating Dial Page into its operations. *See* Amended Complaint at ¶ 56. Plaintiffs contend these integration problems forced MobileMedia to focus on Dial Page at the expense of its other operations. *See id.* Plaintiffs further contend MobileMedia falsely portrayed its growth strategy as successful when it was not. *See id.*

### 5. *The False FCC Filings of MobileMedia*

Plaintiffs allege, in addition to failing to disclose difficulties MobileMedia was experiencing integrating Dial Page, the Secondary Offering Registration Statement and Prospectus failed to disclose MobileMedia had filed false Forms 489. *See* Amended Complaint at ¶ 59.

By December 1995, Belardi is alleged to have been aware a number of authorized stations would not be built within the time frame required by the FCC. *See* Amended Complaint at ¶ 69; 15 October 1996 Report at 11. In December 1995 of January 1996, Belardi is alleged to have informed McVay of the problem concerning the expiring licenses. *See* Amended Complaint at ¶ 70; 15 October 1996 Report at 12.

Plaintiffs allege Belardi suggested to McVay the only viable solution was to timely file the Forms 489 and confirm or complete construction at a later date. *See* Amended Complaint at ¶ 70; 15 October 1996 Report at 12 (Belardi described the proposed inaccurate filings as technical violations, which if discovered would invoke only limited sanctions). Plaintiffs further allege McVay told Belardi to propose this plan to the Board for approval. *See id.* Belardi purportedly received approval for this proposal from Rorke and Kealey at a senior staff meeting in either December 1995 or January 1996. *See id.* at ¶ 71.

The 15 October 1996 Report concerning the false FCC filings stated:

Belardi proceeded to prepare, certify and file an unprecedentedly large number of Forms 489 during the first quarter of 1996. Specifically, some 371 Forms 489 were submitted. To the best of our knowledge, all of these Forms 489 were signed personally by Belardi and all were made through his office. At the time the filings were made, Belardi apparently did not know precisely which stations were in fact constructed and which were not.

Amended Complaint at ¶ 73 (quoting 15 October 1995 Report).

The 15 October 1995 Report further states Belardi continued to file false Forms 489 after the first quarter of 1996. *See* 15 October 1996 Report at 16. Of the sixty-five Forms 489 filed by Belardi after the first quarter of 1996, sixteen were false. *See id.*

### 6. *Alleged Misrepresentations in MobileMedia Credit Agreements*

Plaintiffs contend the filing of false Forms 489 rendered statements concerning the credit agreement (the "Credit Agreement") between MobileMedia and various banks, and included in the Secondary Offering Prospectus and Registration Statement, materially false and misleading. *See* Amended Complaint at ¶ 62. These credit agreements provided funds for the acquisition of MobileComm. *See id.* ¶ 63.

The Credit Agreement provided:

"All of the material properties, equipment and systems owned, leased or managed ... are, and (to the best of the knowledge of the Borrower) all such property, equipment and systems to be acquired or added in connection with any contemplated system expansion or construction will be in good repair, working order and condition *and are and will be in compliance with all terms and conditions of the FCC licenses* and all standards and rules imposed by any Governmental authority.

"The FCC Licenses and PUC Authorizations set forth on an attached schedule are valid and in full force and effect except for ... any such Authorization the absence of which could not reasonably be expected to have a Material Adverse Effect. *No event has occurred which could (I) result in the imposition of a material forfeiture or the revocation, termination or adverse modification of any FCC License* or PUC Authorization specified on the schedule or (ii) materially or adversely affect any rights of the Borrower or any of its Subsidiaries thereunder; *the Borrower has no reason to believe that the FCC Licenses and PUC authorizations on the schedule which it wishes to renew will not be renewed in the ordinary course;* and the Borrower and its Subsidiaries have sufficient time, materials, equipment, contract rights and other required resources to complete, in a timely fashion and in full, construction of any Paging System or PCS System in compliance with all applicable technical standards and construction requirement deadlines. *The current ownership and operation by each of the Borrower and its Subsidiaries of its Mobile Communications Business complies with the Communications Act of 1934, as amended and all Rules, Regulations and Policies of the FCC,* any PUC and of any other Governmental Authority, except for such non-compliance that could not result in a Material Adverse Effect."

Amended Complaint at ¶ 63 (emphasis in Amended Complaint) (quoting Secondary Offering Prospectus).

Plaintiffs allege, at the time MobileMedia entered into the Credit Agreement and covenanted to comply with all FCC licenses and applicable laws, MobileMedia had filed, and continued to file, false Forms 489. *See* Amended Complaint at ¶ 64. Plaintiffs contend, therefore, MobileMedia was in default on its Credit Agreement at the moment of execution. *See id.*

### 7. Alleged False and Misleading Risk Disclosures

The Secondary Offering Registration Statement and Prospectus Contained a section entitled "RISK FACTORS." *See* Secondary Offering Registration Statement and Prospectus at 9–11. Plaintiffs allege the factors delineated in this section were materially false and misleading because the statements "failed to disclose that, at that very moment, [MobileMedia] was actually experiencing these purported 'risks' which were already negatively impacting MobileMedia's business and operations and future prospects." Amended Complaint at ¶ 65.

For example, the Secondary Offering Prospectus stated:

"[MobileMedia] has pursued and intends to continue to pursue acquisitions of wireless communications businesses as a component of its growth strategy. No assurance can be given that suitable acquisition candidates can be identified, purchased and financed on acceptable terms, or that future acquisitions, if completed, will be successful. The success of any completed acquisition will depend on [MobileMedia's] ability to integrate effectively the acquired business into the company. The process of integrating acquired wireless telecommunications businesses may involve unforeseen difficulties and may require a disproportionate amount of management attention and company resources."

Amended Complaint at ¶ 66(a) (quoting Secondary Offering Prospectus at 9).

Plaintiffs contend these statements are materially false and misleading because MobileMedia was warning of possible difficulties integrating acquired businesses at a time when MobileMedia was allegedly experiencing those very same difficulties. *See* Amended Complaint at ¶ 66(b). Plaintiffs allege any difficulties associated with integrating new acquisitions were highly probable considering

the problems that were being experienced with the Dial Page integration. *See id.* According to Plaintiffs, Defendants had no reason to suggest future acquisitions might entail "unforeseen" difficulties. *See id.*

The Risk Factors also addressed possible concerns related to the FCC. The Secondary Offering Prospectus stated:

"[MobileMedia] and the wireless communications industry are subject to regulation by the FCC and various state regulatory agencies. There can be no assurance that either the FCC of those state agencies having jurisdiction over [MobileMedia's] business will not adopt regulations *or take actions which would adversely affect the business of the company.*"

Amended Complaint at ¶ 67 (emphasis in Amended Complaint) (quoting Secondary Offering Prospectus at 10). Plaintiffs allege any disclosure of the filing of false Forms 489 would have created a virtual certainty the FCC would take action, such as refusing to renew license applications, that would have a material adverse impact on MobileMedia. *See id.*

Plaintiffs also contend warnings concerning the customer base of MobileMedia were misleading. The Risk Factors stated:

"The result of operations of wireless communications service providers such as [MobileMedia] are significantly affected by subscriber disconnections. In order to realize net growth in units in service, disconnected subscribers must be replaced and additional subscribers must be added. The sales and marketing costs associated with attracting new subscribers are substantial relative to the costs of providing service to existing subscribers. The Company's average monthly unit disconnect rate ("churn rate") during the nine months ended September 30, 1995 and the year ended 1994 were approximately 2.4% and 2.3%, respectively, of its subscriber base for each period. Although [MobileMedia's] churn rate is below the industry average, there can be no assurance that [MobileMedia] will not experience an increase in its churn rate which may adversely affect [MobileMedia's] results of operations."

Amended Complaint at ¶ 68 (quoting Secondary Offering Prospectus at 11).

Plaintiffs allege MobileMedia was experiencing increased churn rates, at the time the Prospectus became effective, as a result of problems associated with the integration of Dial Page. *See* Amended Complaint at ¶ 68. Plaintiffs contend the warning is misleading because it does not disclose MobileMedia was experiencing the difficulty warned of at the time the statement was made. *See id.*

8. *Alleged False Statements Made in Connection with 1995 Fourth Quarter Results*

On approximately 22 February 1996, MobileMedia released its fourth quarter results for 1995. *See* Amended Complaint at ¶ 75(a). In connection with this release, Rorke stated "1995 was certainly a banner year for Mobile," and he "looked forward to continued growth and increasing levels of service and product offerings in 1996." *See id.*

Plaintiffs allege the statement of Rorke was materially misleading "because, far from being a 'banner year,' 1995 was a year in which MobileMedia had begun to dramatically expand its... practice of filing false Forms 489 with the FCC." *See* Amended Complaint at ¶ 75(b). Plaintiffs argue the increasing number of false filings increased the likelihood of discovery by the FCC. *See id.* Plaintiffs further argue discovery by the FCC would cause the FCC to revoke the existing licenses of MobileMedia and refuse to grant it new ones. *See id.* Therefore, Plaintiffs allege statements regarding "continued growth" and "increasing levels of service and product offerings in 1996" were made without a reasonable basis. *See id.*

9. *Alleged False and Misleading 1995 Form 10–K*

On 29 March 1996, MobileMedia filed its Form 10–K (the "1995 Form 10–K") for the fiscal year ending 31 December 1995 with the SEC. *See* Amended Complaint at ¶ 77. The 1995 Form 10–K was signed by Rorke and Kealey. *See id.*

The 1995 Form 10–K repeated statements concerning the ability of the FCC to revoke

an existing license or deny an application for a new license. *See* Amended Complaint at ¶ 77. Plaintiffs allege MobileMedia again falsely stated it was " 'unaware of any circumstances which would prevent the grant of pending or future renewal applications.' " *See id.* (quoting 1995 Form 10–K).

Plaintiffs also allege MobileMedia falsely portrayed the MobileComm acquisition. *See* Amended Complaint at ¶ 81. The 1995 Form 10–K stated:

> The Company believes the MobileComm acquisition has solidified and will continue to enhance its competitive position due to increased scale, wider sales coverage, greater spectrum capacity and penetration of a broader range of distribution channels, particularly retail sales to individual customers.

*See id.* Plaintiffs claim this statement was misleading because it failed to disclose integration problems that were being experienced at the time. *See id.*

Plaintiffs further claim the 1995 Form 10–K was materially false and misleading because it created the impression the acquisition of MobileComm was causing an increase in subscribers. *See id.* Plaintiffs allege at the time the 1995 Form 10–K was filed MobileMedia was facing an increased churn rate. *See id.*

The 1995 Form 10–K did include cautionary language stating " '[t]he success of the resulting combined business will depend on management's ability to integrate effectively [MobileMedia's] and MobileComm's business." *See* Amended Complaint at ¶ 81. Plaintiffs allege this disclaimer is boilerplate and did not disclose problems being experienced at the time of the statement. *See id.*

In addition, the 1995 Form 10–K made reference to and attached the Credit Agreement. *See* Amended Complaint at ¶ 78. Plaintiffs allege references to the Credit Agreement in the 1995 Form 10–K were materially false and misleading for the same reasons references to the Credit Agreement in the Secondary Offering Registration Statement were false and misleading. *See id.* at ¶ 79–80.

10. *Alleged False and Misleading Press Releases*

On 13 May 1996, MobileMedia issued a public statement concerning, among other things, financial results for the first quarter ending 31 March 1996 (the "13 May 1996 Press Release"). *See* Amended Complaint at ¶ 83. Rorke and Kealey were quoted as stating:

> " 'Our first quarter was an excellent and exciting time,' Rorke, MobileMedia Chief Executive Officer, stated. 'We cleared regulatory hurdles in our acquisition of MobileComm more than two months ahead of schedule, which saved $16.3 million off the purchase price and allowed us to start the integration process sooner than we expected. Thanks to the dedication of all our employees we are fast becoming one dynamic, nationwide company.'

> " 'The integration of MobileComm is ahead of schedule.' Kealey, MobileMedia's president and chief operating officer, added. 'The speed of the integration will impact short-term results due to the acceleration of expenses, but we believe that the consolidation of operations (customer service, billing, credit and collections, and inventory distribution) will position the company for long-term success. Our integration strategy, first with Dial Page and now with MobileComm, continues to build on the MobileMedia consolidated nationwide platform.' "

*Id.* (quoting 13 May 1996 Press Release).

Plaintiffs allege the 13 May 1996 Press Release was materially false and misleading because Rorke and Kealey failed to disclose certain information. *See* Amended Complaint at ¶ 84. This information is alleged to have been known to, or recklessly disregarded by, Rorke and Kealey. *See id.* In particular, Plaintiffs allege Rorke and Kealey omitted information concerning the integration problems MobileMedia was experiencing at the time of the statement and the filing of false Forms 489 with the FCC. *See id.*

On 6 June 1996, MobileMedia issued a press release concerning the integration of MobileComm and Dial Page (the "6 June 1996 Press Release"). *See* Amended Com-

plaint at ¶ 86. In the 6 June 1996 Press release, Rorke stated:

> "The integration of MobileComm is ahead of schedule.... While the speed of the integration will impact short-term results due to increased expenses, these investments in the integration to rationalize network capacity and consolidate operations (customer service, billing and management information systems, and inventory management and order fulfillment, among other functions) will position [MobileMedia] for long-term success. Our integration strategy, first with Dial Page and now with MobileComm continues to build on our consolidated nationwide platform."

*See id.* (quoting 6 June 1996 Press Release).

Plaintiffs allege references to "unspecified integration costs" and to the integration of MobileComm, in the 6 June 1996 Press Release, did not accurately reflect the situation of MobileMedia. *See* Amended Complaint at ¶ 86. According to Plaintiffs, the consolidation of Dial Page and MobileComm had come to represent a "functional disaster" by June 1996. *See id.* at ¶ 87

On 15 July 1996, MobileMedia announced several management changes (the 15 July 1996 Press Release). *See* Amended Complaint at ¶ 90. Bayer was quoted as stating:

> "The Board and I believe strongly in MobileMedia's prospects and the wireless messaging industry in general. *We will ensure that we continue to provide our customers with the best and most reliable service.* In that regard, we will continue to pursue [MobileMedia's] strategy of strengthening and extending its market leadership and competitive position. We will do this by accommodating our growing subscriber base through our broad base of spectrum resources; expanding sales coverage to new geographic regions and increasing distribution channel penetration; developing strategic marketing alliances to access new distribution channels and demographic groups; and building critical mass to establish competitively advantageous economies of scale."

*Id.* (emphasis in original) (quoting 15 July 1996 Press Release).

Plaintiffs contend the statement MobileMedia would "continue" to provide "reliable service" was materially false and misleading. *See* Amended Complaint at ¶ 92. Plaintiffs allege at the time of the 15 July 1996 Press Release, Bayer was aware the company was not providing reliable service to its customers. *See id.* Plaintiffs further allege Bayer knew the internal problems MobileMedia was experiencing would prevent reliable service from being offered. *See id.*

On 25 July 1996, MobileMedia announced financial results for the second quarter ended 30 June 1996 (the "25 July 1996 Press Release"). *See* Amended Complaint at ¶ 93. MobileMedia announced a net loss for this quarter. *See id.* In addition, Bayer stated:

> "The wireless messaging industry continues to grow at a strong pace, and MobileMedia continues to capture a large share of that growth. In addition, *we continue to make good progress in working through the challenges involved with integrating our acquisition of MobileComm,* and expect to have the integration completed within our planned 18–month time frame."

*Id.* (emphasis in Amended Complaint) (quoting 25 July 1996 Press Release.)

Plaintiffs allege instead of making good progress integrating MobileComm, MobileMedia was experiencing serious problems. *See* Amended Complaint at ¶ 94. Plaintiffs further allege Bayer knew of these problems or recklessly disregarded them. *See id.*

11. *The Alleged Corrective Statement*

On 27 September 1996, the last day of the Class Period, MobileMedia issued a press release. *See* Amended Complaint at ¶ 103. The 27 September 1996 Press Release stated:

> "[MobileMedia] ... said that it has discovered certain errors in the licensing process for a number of its local transmission one-way paging stations. [MobileMedia] has appointed outside counsel to conduct an independent investigation into the licensing errors. [MobileMedia] also has commenced discussions with the [FCC] regarding the errors and will deliver the report of its investigation to the FCC upon completion. [MobileMedia] cannot be cer-

tain what action the FCC may take in regard to this matter, but such actions could have a material adverse effect upon the financial condition or operations of [MobileMedia]."

See id. (quoting 27 September 1996 Press Release). Plaintiffs allege this announcement directly contradicted previous statements of MobileMedia concerning its business, management, integration process and compliance with FCC rules and Regulations. See id.

Also in the 27 September 1996 Press Release, MobileMedia declared third quarter 1996 results would be affected by the acquisition of MobileComm. See Amended Complaint at ¶ 105. The 27 September 1996 Press Release stated:

"MobileMedia... today estimated that, due to continuing costs and increased subscriber churn associated with the integration of the operations of MobileComm, earnings before interest, taxes, depreciation and amortization for the third quarter ending September 30, 1996 are expected to be approximately $35 million.

"The Company noted that third quarter results would, absent waivers or certain other events, place the company in violation of certain covenants in [the Credit Agreement]." [MobileMedia] is working with its banks as well as its financial advisors on measures to address these issues.

" 'Third quarter earnings have been significantly impacted by the effects of the integration of the operations of MobileComm, the largest ever in the paging industry, which doubled the size of the company. As [MobileMedia] has previously stated, we expect to carry additional costs throughout the integration period, which is expected to be completed by the end of the second quarter of 1997. In addition, the difficulties associated with the integration of two sizeable companies have caused subscriber churn to increase from that reported for the first half of 1996.' "

Amended Complaint at ¶ 105 (emphasis in Amended Complaint) (quoting 27 September 1996 Press Release).

Plaintiffs allege the market reaction to the 27 September 1996 Press Release caused MobileMedia stock to fall approximately 31% from $6.50 per share to $4.50 per share. See Amended Complaint at ¶ 106. On 30 September 1996 the value of MobileMedia stock fell another 8% to $4.125 per share.

The value of MobileMedia stock continued to fall after additional information concerning MobileMedia and its financial status were released. See Amended Complaint at ¶¶ 108–113. On 2 December 1996 the market price for MobileMedia stock was $1 per share. See Amended Complaint at ¶ 113.

*Discussion*

A. *Standard For Dismissal Under Rule 12(b)(6) and 15 U.S.C. § 78u–4(b)(3)*

A court may dismiss a complaint pursuant to Rule 12(b)(6) for failure to state a claim where it appears beyond doubt that no relief could be granted under any set of facts which could be proved consistent with the allegations. See Hartford Fire Ins. Co. v. California, 509 U.S. 764, 811, 113 S.Ct. 2891, 125 L.Ed.2d 612 (1993); Hishon v. King & Spalding, 467 U.S. 69, 73, 104 S.Ct. 2229, 81 L.Ed.2d 59 (1984); Conley v. Gibson, 355 U.S. 41, 45–46, 78 S.Ct. 99, 2 L.Ed.2d 80 (1957); Weiner v. Quaker Oats Co., 129 F.3d 310, 315 (3d Cir.1997); Unger v. National Residents Matching Program, 928 F.2d 1392, 1395 (3d Cir.1991); Markowitz v. Northeast Land Co., 906 F.2d 100, 103 (3d Cir.1990); Ransom v. Marrazzo, 848 F.2d 398, 401 (3d Cir.1988).

Because granting a motion under Rule 12(b)(6) can result in a dismissal at an early stage of a case, all allegations of a plaintiff must be taken as true and all reasonable factual inferences drawn in his or her favor. See Gomez v. Toledo, 446 U.S. 635, 636, 100 S.Ct. 1920, 64 L.Ed.2d 572 (1980); Weiner, 129 F.3d at 315; In re Burlington Coat Factory Sec. Litig., 114 F.3d 1410, 1420 (3d Cir.1997); Piecknick v. Pennsylvania, 36 F.3d 1250, 1255 (3d Cir.1994); Jordan v. Fox, Rothschild, O'Brien & Frankel, 20 F.3d 1250, 1261 (3d Cir.1994); Shapiro v. UJB Fin. Corp., 964 F.2d 272, 279–80 (3d Cir.), cert. denied, 506 U.S. 934, 113 S.Ct. 365, 121 L.Ed.2d 278 (1992); Schrob v. Catterson, 948 F.2d 1402, 1405 (3d Cir.1991); Unger, 928

F.2d at 1395; *Markowitz v. Northeast Land Co.*, 906 F.2d 100, 103 (3d Cir.1990); *Melikian v. Corradetti*, 791 F.2d 274, 277 (3d Cir. 1986).

■ A complaint should not be dismissed unless it appears beyond doubt that "the facts alleged in the complaint, even if true, fail to support the claim." *Ransom*, 848 F.2d at 401; *see also Shapiro*, 964 F.2d at 279–80. Legal conclusions made in the guise of factual allegations, however, are given no presumption of truthfulness. *See Papasan v. Allain*, 478 U.S. 265, 286, 106 S.Ct. 2932, 92 L.Ed.2d 209 (1986); *Morse v. Lower Merion Sch. Dist.*, 132 F.3d 902, 906 (3d Cir.1997) ("[A] court need not credit a complaint's 'bald assertions' or 'legal conclusions' when deciding a motion to dismiss"); *Haase v. Webster*, 807 F.2d 208, 215 (D.C.Cir.1986), *vacated on other grounds*, 835 F.2d 902 (D.C.Cir.1987); *Briscoe v. LaHue*, 663 F.2d 713, 723 (7th Cir.1981), *aff'd*, 460 U.S. 325, 103 S.Ct. 1108, 75 L.Ed.2d 96 (1983); *Western Mining Council v. Watt*, 643 F.2d 618, 626 (9th Cir.), *cert. denied*, 454 U.S. 1031, 102 S.Ct. 567, 70 L.Ed.2d 474 (1981); *Bermingham v. Sony Corp. of Am.*, 820 F.Supp. 834, 846 (D.N.J. 1992), *aff'd*, 37 F.3d 1485 (3d Cir.1994).

A district court reviewing the sufficiency of a complaint has a limited role. "The issue is not whether a plaintiff will ultimately prevail but whether the claimant is entitled to offer evidence to support his [or her] claims." *Scheuer v. Rhodes*, 416 U.S. 232, 236, 94 S.Ct. 1683, 40 L.Ed.2d 90 (1974); *In re Burlington Coat Factory Sec. Litig.*, 114 F.3d at 1420; *Bermingham*, 820 F.Supp. at 846. Generally, when conducting such an inquiry, a district court generally may not consider any material beyond the pleadings. *See In re Burlington Coat Factory Sec. Litig.*, 114 F.3d at 1426; *Pension Benefit Guar. Corp. v. White Consol. Indus.*, 998 F.2d 1192, 1196 (3d Cir.1993), *cert. denied*, 510 U.S. 1042, 114 S.Ct. 687, 126 L.Ed.2d 655 (1994); *Wallace v. Systems & Computer Tech. Corp.*, No. 95–6303, 1997 WL 602808, at *5 (E.D.Pa.

Sept.23, 1997); *Gannon v. Continental Ins. Co.*, 920 F.Supp. 566, 574 (D.N.J.1996).

■ A district court, however, may properly refer to the factual allegations contained in other documents, such as documents referred to in the complaint and matters of public record if the claims of the plaintiff are based upon those documents. *See In re Burlington Coat Factory Sec. Litig.*, 114 F.3d at 1426; *In Re Westinghouse Sec. Litig.*, 90 F.3d 696, 707 (3d Cir.1996); *In re Donald Trump Casino Sec. Lit.*, 7 F.3d 357, 368 n. 9 (3d Cir.1993), *cert. denied*, 510 U.S. 1178, 114 S.Ct. 1219, 127 L.Ed.2d 565 (1994); *Pension Benefit Guar. Corp.*, 998 F.2d at 1196; *Wallace*, 1997 WL 602808, at *5; *Weiner*, 928 F.Supp. at 1380; *Gannon*, 920 F.Supp. at 574. In other words, such documents must be "integral to or explicitly relied upon in the complaint." *In re Burlington Coat Factory Sec. Litig.*, 114 F.3d at 1426 (quoting *Shaw v. Digital Equip. Corp.*, 82 F.3d 1194, 1220 (1st Cir.1996)). The reason for this rule is to prevent:

> [t]he situation in which a plaintiff is able to maintain a claim of fraud by extracting an isolated statement from a document and placing it in the complaint, even though if the statement were examined in the full context of the document, it would be clear that the statement was not fraudulent.

*In re Burlington Coat Factory Sec. Litig.*, 114 F.3d at 1426. Under these circumstances, reference to documents outside of the complaint does not convert a motion to dismiss into a motion for summary judgment. *See In re Burlington Coat Factory Sec. Litig.*, 114 F.3d at 1426; *Pension Benefit Guar. Corp.*, 998 F.2d at 1196–97.[12]

**B. *The Securities Act and Exchange Act***

■ In general, the Securities Act regulates the initial distribution of securities, *see Gustafson v. Alloyd Co.*, 513 U.S. 561, 571–72, 115 S.Ct. 1061, 131 L.Ed.2d 1 (1995) (citations omitted), and the Exchange Act regulates post-distribution trading. *See Cen-*

---

**12.** Relying upon this exception, the following will be considered:

 (1) The 15 October 1996 Report

 (2) The Secondary Offering Prospectus and Registration Statement

 (3) The 1995 Form 10K

 (4) The 1996 Form 8–K

 (5) The 14 September 1995 Press Release

 (6) The 22 February 1996 Press Release

 (7) The 13 May 1996 Press Release

 (8) The 6 June 1996 Press Release

 (9) The 15 July 1996 Press Release

 (10) The 25 July 1996 Press Release

 (11) The 27 September 1996 Press Release

*tral Bank of Denver, N.A. v. First Interstate Bank of Denver, N.A.,* 511 U.S. 164, 171, 114 S.Ct. 1439, 128 L.Ed.2d 119 (1994) (citing *Blue Chip Stamps v. Manor Drug Stores,* 421 U.S. 723, 752, 95 S.Ct. 1917, 44 L.Ed.2d 539 (1975)). Together with the Securities Act, the Exchange Act "embrace[s] a fundamental purpose ... to substitute a philosophy of full disclosure for the philosophy of caveat emptor." *See id.* (quoting *Affiliated Ute Citizens of Utah v. United States,* 406 U.S. 128, 151, 92 S.Ct. 1456, 31 L.Ed.2d 741 (1972)) (internal quotation marks omitted).

■■■ The Securities Act and the Exchange Act create a detailed scheme of civil liability. *See Central Bank of Denver,* 511 U.S. at 171. The SEC is able to commence an administrative action and an injunctive proceeding to enforce statutory prohibitions. *See id.* Private plaintiffs are also empowered to commence litigation under the express private rights of action contained in both the Securities Act and the Exchange Act. *See id.*

1. *Sections 11 and 12(a)(2) of the Securities Act*

■■ Count One alleges a violation of Section 11. *See* Amended Complaint at ¶¶ 117–

128. Pursuant to Section 11 certain enumerated persons may be liable for material misstatements and omissions found in any portion of a registration statement.[13] *See* Section 11. To state a claim under Section 11, a plaintiff must allege:

1) The plaintiffs purchased securities traceable to an effective registration statement;

2) The defendants fall within the statutorily enumerated categories;[14] and

3) the registration statement, at the time it became effective, contained a material misstatement or omission.

*See Herman & MacLean v. Huddleston,* 459 U.S. 375, 381–82, 103 S.Ct. 683, 74 L.Ed.2d 548 (1983); *In re Trump,* 7 F.3d at 365 n. 2, 368 n. 10; Section 11. A plaintiff need not plead fraud, reliance, motive, intent, knowledge or scienter under Section 11. *See Herman & MacLean,* 459 U.S. at 381–82, 103 S.Ct. 683; *Ernst & Ernst v. Hochfelder,* 425 U.S. 185, 200, 96 S.Ct. 1375, 47 L.Ed.2d 668 (1976); *In re Donald J. Trump Sec. Litig.,* 7 F.3d 357, 368 n. 10 (3d Cir.1993).[15]

■■■ Count Two alleges a claim pursuant to Section 12(a)(2). *See* Amended Com-

13. Section 11 provides:
In case any part of the registration statement, when such part became effective, contained an untrue statement of a material fact or omitted to state a material fact required to be stated therein or necessary to make the statements therein not misleading, any person acquiring such security (unless it is proved that at the time of such acquisition he [or she] knew of such untruth or omission) may, either at law or in equity, in any court of competent jurisdiction, sue ... every accountant, engineer, or appraiser, or any person whose profession gives authority to a statement made by him [or her], who has with his [or her] consent been named as having prepared or certified any part of the registration statement, or as having prepared or certified any report or valuation which is used in connection with the registration statement, with respect to the statement in such registration statement, report, or valuation, which purports to have been prepared or certified by him [or her].
Section 11.

14. The Following are subject to liability pursuant to Section 11:
(1) every person who signed the registration statement;

(2) every person who was a director of (or person performing similar functions) or partner in the issuer at the time of the filing of the part of the registration statement with respect to which his liability is asserted;
(3) every person who, with his consent, is named in the registration statement as being or about to become a director, person performing similar functions, or partner;
(4) every accountant, engineer, or appraiser, or any person whose profession gives authority to a statement made by him, who has with his consent been named as having prepared or certified any part of the registration statement, or as having prepared or certified any report or valuation which is used in connection with the registration statement, with respect to the statement in such registration statement, report, or valuation, which purports to have been prepared or certified by him; [and]
(5) every underwriter with respect to such security.
Section 11(a)(1–5).

15. Because Section 11 is limited in scope, it places a relatively minimal burden on the plaintiff. *See Herman & MacLean,* 459 U.S. at 382, 103 S.Ct. 683. Section 11 "was designed to assure compliance with the disclosure provisions

plaint at ¶¶ 129–37. Pursuant to Section 12 any person who offers or sells a security may be held liable for material misstatements or omissions found in a prospectus. To state a claim under Section 12(a)(2) a plaintiff must allege

> 1) [d]efendants offered or sold a security;
>
> 2) [b]y the use of any means of communication in interstate commerce;
>
> 3) [t]hrough a prospectus or oral communication;
>
> 4) [b]y making a false or misleading statement of a material fact or by omitting to state a material fact necessary in order to make the statements, in light of the circumstances under which they were made, not misleading;
>
> 5) [p]laintiff did not know of the untruth or omission; and
>
> 6) [d]efendants knew, or in the exercise of reasonable care, could have known of the untruth or omission.

*Ballay v. Legg Mason Wood Walker, Inc.*, 925 F.2d 682, 687–88 (3d Cir.1991). Similar to Section 11, a plaintiff need not plead fraud, reliance or scienter on the part of the defendants to succeed under Section 12(a)(2).[16] *See Trump*, 7 F.3d at 368 n. 10.

### a. *The Integration Allegations*

Section 11 and Section 12(a)(2) claims must allege material misrepresentations or omissions based upon the facts as they existed at the time of the offering. *See Trump*, 7 F.3d at 368. Defendants argue the integration problems, as alleged by the Secondary Offering Plaintiffs, were not known at the time the Secondary Offering Registration Statement and Prospectus became effective. *See* Moving Brief at 8–12. Defendants further argue the misrepresentation allegations concerning integration problems are based solely upon events which occurred after the Secondary Offering. *See id.* at 8. Defendants contend such allegations are insufficient as a matter of law. *See id.*

The Secondary Offering Plaintiffs allege the following information was known to MobileMedia at the time the Secondary Offering Registration Statement and Prospectus became effective:

- *"Technical Problems.* The Company was experiencing significant and substantial problems assimilating and absorbing Dial Page's subscriber base. In addition, the Company was incurring increasing costs associated with the integration of units-in-service between paging networks which was necessary to balance out capacity and prevent network overcrowding;"

- *"Billing Problems.* The Company was experiencing significant and substantial problems in smoothly assimilating Dial Page customers into its billing system and, accordingly, was in some cases not billing customers or incorrectly billing customers;"

- *"Churn rate.* The Company was experiencing a higher rate of churn—customers disconnecting their pagers—than it anticipated prior to the Dial Page acquisition. This increase in churn rate was directly related to the Company's problems successfully integrating the subscriber base of Dial Page into its technical base and billing system. Thus, as customers experienced problems with either the technical operation of their pager or billing for its use, they opted to disconnect it. . . ."

- *"Personnel.* The Company was incurring increasing costs as it was forced to hire additional personnel to focus on the integration of Dial Page. In addition, the Company was not, through the Dial Page acquisition, effectively eliminating duplicative costs as was intended and publicly represented. Moreover . . . the turnover

---

of the [Securities] Act by imposing a stringent standard of liability. . . . Liability against the issuer of a security is virtually absolute, even for innocent misstatements." *See id.* at 381–82, 103 S.Ct. 683.

**16.** The Supreme Court has observed that unlike Section 10(b), which requires proof of fraud, reasonable reliance and scienter, the significant procedural protections provided by Section 11 and Section 12(a)(2) allow recovery upon proof of negligent conduct. *See Herman & MacLean*, 459 U.S. at 383–84, 103 S.Ct. 683; *Hochfelder*, 425 U.S. at 208–10 & n. 27, 96 S.Ct. 1375.

in personnel and organizational changes following the Dial Page acquisition caused MobileMedia's procedures for tracking license authorizations to collapse..."

- *"Compliance with FCC Rules and Regulations ...* [T]he number of false Forms 489 filed with the FCC, while already substantial, began to increase in the Fall of 1995 as MobileMedia encountered significant difficulty integrating the license authorizations related to the Dial Page acquisition into its database tracking system.... [B]y the Fall of 1995, the Company's internal system for tracking authorizations and construction status had collapsed. Moreover, defendants had been informed that MobileComm also had significant FCC compliance problems..."

Amended Complaint at ¶ 57.

In addition, The Secondary Offering Plaintiffs allege the following statement, included in the "Risk Factors" portion of the Secondary Offering Registration Statement, was materially false or misleading at the time it was made:

The success of any completed acquisition will depend on the Company's ability to integrate effectively the acquired businesses into the Company. The process of integrating acquired wireless communications businesses may involve *unforeseen difficulties* and may require a disproportionate amount of management attention and Company resources.

Amended Complaint at ¶ 66(a) (emphasis in Amended Complaint).

The Secondary Offering Plaintiffs assert the above statements were materially misleading because MobileMedia omitted material facts concerning problems with the integration of Dial Page. Specifically, as of the date of the Secondary offering, the Secondary Offering Plaintiffs allege MobileMedia was aware of technical problems in assimilating and absorbing Dial Page's subscriber base, billing problems arising from the assimilation of Dial Page customers, an increased churn rate, and increased personnel expenses. *See* Amended Complaint at ¶¶ 57, 66.

■ Defendants first argue these allegations are conclusory and unsupported and should be dismissed. *See* Moving Brief at 11. As mentioned, "a court need not credit a complaint's 'bald assertions or legal conclusions' when deciding a motion to dismiss." *In re Burlington Coat Factory,* 114 F.3d at 1429.

In the instant matter, the Secondary Offering Plaintiffs have provided more than mere assertions and legal conclusions to support their claims. For example, the 15 October 1996 Report, read in a light most favorable to the Secondary Offering Plaintiffs, supports the allegations that integration problems existed as of the Secondary Offering. *See* 15 October 1996 Report at 10 (noting problems integrating Dial Page negatively impacted regulatory compliance tracking as early as September 1995); *id.* at 11 (noting MobileMedia was having managerial problems and transition difficulties in early 1995). These allegations of the Amended Complaint are sufficient to support the inference statements of MobileMedia were false or misleading at the time of the Secondary Offering.

■ Defendants next argue the facts supporting the allegations of the Secondary Offering Plaintiffs are all based upon hindsight. *See* Moving Brief at 12. Defendants argue claims based solely upon hindsight are inactionable. *See id.*

■ "Fraud by hindsight" has been defined as the "attempt to impose liability on management for unrealized economic predictions." *See Sinay v. Lamson & Sessions Co.,* 948 F.2d 1037, 1040 (6th Cir.1991); *Zucker v. Quasha,* 891 F.Supp. 1010, 1014 (D.N.J.), *aff'd* 82 F.3d 408 (3d Cir.1996). To be actionable, a statement or omission must be misleading at the time it was made. *See Zucker,* 891 F.Supp. at 1014. Liability cannot be imposed on the basis of subsequent events. *See id.* at 1016–17 (filing for bankruptcy four months after offering, could not be used to support claim corporation was in a precarious financial position at the time of the offering).

In the instant matter, the Secondary Offering Plaintiffs do not seek to infer the exis-

tence of integration problems at the time of the Secondary Offering from later occurrences. Rather, the Secondary Offering Plaintiffs allege, independent of later events, the integration problems existed at the time the Secondary Offering was made.

As previously stated, the Amended Complaint alleges MobileMedia, at the time of the Secondary Offering, was experiencing technical problems, billing problems, an increased churn rate, increased personnel expenses, and problems complying with FCC rules and regulations. *See* Amended Complaint at ¶ 57. As noted above, the Amended Complaint, supported by the 15 October 1996 Report, further alleges these problems existed as of the date of the Secondary Offering. *See* Amended Complaint at ¶¶ 56–57, 65; 15 October 1996 Report at 10–11.

Unlike *Zucker,* where the plaintiffs sought to imply financial troubles from the later filing of a bankruptcy petition, Secondary Offering Plaintiffs do not seek to imply integration problems at the time of the Secondary Offering from later events or disclosures. Accordingly, the Amended Complaint sufficiently alleges the Secondary Offering Registration Statement and Prospectus were misleading at the time they were made and are not fraud by hindsight.

█ Defendants next argue even if the allegations of the Secondary Offering Plaintiffs are not "fraud by hindsight," the integration problems represent instances of corporate mismanagement. *See* Moving Brief at 13–14 n. 5. The Supreme Court held acts constituting no more than internal corporate mismanagement were not actionable under the Federal securities laws. *See Santa Fe Indus. v. Green,* 430 U.S. 462, 479, 97 S.Ct. 1292, 51 L.Ed.2d 480 (1977) (holding instances of corporate mismanagement are inactionable in the context of Section 10(b)); *In re Craftmatic Sec. Litig.,* 890 F.2d 628, 637–40 (3d Cir.1989) (applying *Santa Fe* to claims brought under Section 11 and Section 12(a)(2)).

█ "Although allegations of failure to disclose mismanagement alone do not state a claim under the federal securities law, a claim that defendants failed to disclose material facts may be actionable." *In re Craftmatic,* 890 F.2d at 639; *see also Virginia Bankshares, Inc. v. Sandberg,* 501 U.S. 1083, 1098 n. 7, 111 S.Ct. 2749, 115 L.Ed.2d 929 (1991) (once statements are made there is an obligation not to mislead). The line between the nondisclosure of material information and the nondisclosure of mismanagement is often difficult to discern. *See In re Craftmatic,* 890 F.2d at 639.

█ Allegations of material omissions may serve as the basis for liability "when the value of disclosure does not depend solely on whether there has been … ineptitude on the part of management." *See id.* at 640. In the instant matter, Secondary Offering Plaintiffs allege the failure of MobileMedia to disclose integration problems was materially misleading, given statements MobileMedia chose to make in the Secondary Offering Prospectus and Registration Statement.

*In re Craftmatic* addressed the question of whether certain allegations in the plaintiffs' complaint constituted inactionable instances of mismanagement. *See* 890 F.2d at 639–40. For example, the prospectus there at issue attributed the success of Craftmatic to its advertising, promotion and marketing program. *See id.* at 640. The prospectus stated Craftmatic "and its distributors … constitute the leading group engaged in direct in-home sales of adjustable beds and custom-fitted reclining chairs." *See id.* The prospectus further stated Craftmatic believed it "is presently in compliance with consumer protection requirements." *See id.*

The Circuit found allegations Craftmatic failed to disclose violations of consumer protection laws were sufficient to state a claim under Section 11 and Section 12(a)(2). *See In re Craftmatic,* 890 F.2d at 640. Because Craftmatic had chosen to state its past success was attributable to its marketing program, the Circuit concluded the failure or Craftmatic to disclose violations of consumer law, which would negatively impact its marketing ability, could be found to be materially misleading. *See id.* The Circuit, therefore, reversed the dismissal of the Section 11 and 12(a)(2) claims as it pertained to these statements. *See id.*

The Secondary Offering Plaintiffs, similar to the plaintiffs in *Craftmatic*, allege material omissions that are independent of the existence of mismanagement. Secondary Offering Plaintiffs allege MobileMedia was aware it was experiencing material difficulties integrating Dial Page at the time it stated it believed the MobileComm acquisition would enhance its competitive position. *See* Secondary Offering Prospectus at 3. Plaintiffs contend MobileMedia had no reasonable basis for believing it could successfully integrate MobileComm given the problems it was already experiencing integrating Dial Page. *See* Amended Complaint at ¶ 58. This allegation of lack of reasonable basis for a statement is not encompassed within the exception to liability for failure to disclose corporate mismanagement. *See In re Craftmatic*, 890 F.2d at 640.

The allegations of the Secondary Offering Plaintiffs are not primarily concerned with the instances of mismanagement that may have created the integration problems. Rather, Secondary Offering Plaintiffs allege when MobileMedia chose to speak, it had an obligation not to mislead. Accordingly, the Amended Complaint will not be dismissed on the grounds it alleged only instances of mismanagement.

■ Defendants next argue the statements representing management opinion are mere "puffery". *See* Moving Brief at 15–16. Puffery, or projections of future performance not worded as a guarantee, are generally found to be immaterial, and thus inactionable, under Federal securities law. *See In re Burlington Coat Factory*, 114 F.3d at 1427–28; *Lasker v. New York State Elec. & Gas Corp.*, 85 F.3d 55, 59 (2d Cir.1996); *In re Trump*, 7 F.3d at 369 n. 11 ("The term 'soft information' refers to statements of subjective analysis or extrapolation, such as opinion, motives, and intentions, or forward looking statements, such as projections, estimates, and forecasts."); *Raab v. General Physics Corp.*, 4 F.3d 286, 289 (4th Cir. 1993). These "puffing" statements are immaterial because no reasonable investor would rely upon them, given their vagueness and obvious hyperbole. *See Parnes v. Gateway 2000, Inc.*, 122 F.3d 539, 547 (8th Cir.

1997); *San Leandro Emergency Med. Plan v. Philip Morris Co.*, 75 F.3d 801, 811 (2d Cir.1996) (puffery cannot mislead the reasonable investor and cannot constitute actionable statements under the securities laws); *Raab v. General Physics Corp.*, 4 F.3d at 289.

Defendants argue the following statements, alleged to be materially false or misleading by the Secondary Offering Plaintiffs, are forward looking statements of the business objectives of MobileMedia:

- Management believes that future success in these markets will depend upon satisfying business and individual consumers' demand for advanced personal messaging, wireless data applications and next-generation two-way narrowband PCS at competitive rates. [MobileMedia] believes to meet these demands successful wireless communications companies must have sufficient spectrum capacity, national sales coverage through multiple distribution channels and operational economies of scale. [MobileMedia] believes that it will be one of a limited number of companies that will have these resources.

- [MobileMedia] believes the MobileComm acquisition will enhance its competitive position due to its increased scale, wider sales coverage, greater spectrum capacity and penetration of broader range of distribution channels, particularly retail sales to individual consumers.

In *In re Burlington Coat Factory*, the defendant stated the company "believed it could continue to grow earnings at a faster rate than sales." 114 F.3d at 1427. The Circuit found this statement was a "general, non-specific statement of optimism or hope." *See id.* As a result, the Circuit held the statement was too vague to be actionable under Federal securities law. *See id.* at 1428.

■ Statements concerning management's beliefs as to what it would take to succeed in the mobile communications industry are not challenged as being false or misleading. *See* Amended Complaint at ¶¶ 54–56. Rather, Secondary Offering Plaintiffs allege the statement "[MobileMedia] believes

that it will be one of a limited number of companies that will have these resources" was materially misleading in light of the fact it was experiencing problems integrating Dial Page. *See id.* at ¶ 56.

The challenged statement, however, is the type of general, non-specific statement of optimism or hope that has been found to be inactionable. The challenged statement is analogous to the statement "[Burlington Coat Factory] believed it could continue to grow earnings at a faster rate than sales." *See In re Burlington Coat Factory,* 114 F.3d at 1427. This statement by MobileMedia is a soft statement of belief that is not the type of statement that has been found capable of "duping" the market. *See id.* Accordingly, paragraph 54 of the Amended Complaint, is immaterial and cannot serve as the basis for liability. *See id.; Lasker,* 85 F.3d at 59 (statement that "business strategies would lead to continued prosperity" found to be immaterial puffery).

▮ The statement "MobileMedia believes the MobileComm acquisition will enhance its competitive position" is not a general, non-specific statement. This statement specifically draws a link between future success and the acquisition of MobileComm. This is not the type of statement that has been found to be inactionable puffery. *See, e.g., Weiner,* 129 F.3d at 320 (statement that corporation was confident of achieving at least 7% real earnings growth was not the type of vague expression of optimism that had been found to be immaterial). Accordingly, if as Secondary Offering Plaintiffs allege, MobileMedia could have had no reasonable basis for this belief, given the problems it was experiencing integrating Dial Page, then this statement may serve as the basis for liability.

▮ Defendants additionally argue the challenged forward looking statements are inactionable pursuant to the bespeaks caution doctrine and the safe harbor created by the Securities Act for forward looking statements. The "bespeaks caution" doctrine provides that when

'forecasts, opinions or projections are accompanied by meaningful cautionary state-

ments, the forward-looking statements will not form the basis for a securities fraud claim if those statements did not affect the 'total mix' of information ... provided investors. In other words, cautionary language, if sufficient, renders the alleged omissions or misrepresentations immaterial as a matter of law.'

*Weiner,* 129 F.3d at 320 (quoting *In re Trump,* 7 F.3d at 371). The doctrine is a "shorthand for the well-established principle that a statement or omission must be considered in context, so that accompanying statements may render it immaterial as a matter of law." *In re Donald Trump Sec. Litig.,* 7 F.3d at 363.

▮ Not all disclaimers are inactionable pursuant to the "bespeaks caution" doctrine. "[V]ague or blanket (boilerplate) disclaimer which merely warns the reader that the investment has risks will ordinarily be inadequate to prevent misinformation." *In re Donald Trump Sec. Litig.,* 7 F.3d at 371. In order for a disclaimer to fall within the protection of the doctrine:

[T]he cautionary statements must be substantive and tailored to the specific future projections, estimates or opinions in the prospectus which the plaintiffs challenge.

*Id.* at 371–72. A defendant must establish that the cautionary statements "relate directly to that on which investors claim to have relied." *Kline,* 24 F.3d at 489. A cautionary statement must discredit the alleged misrepresentations to such an extent that "the risk of real deception drops to nil." *Virginia Bankshares, Inc. v. Sandberg,* 501 U.S. 1083, 111 S.Ct. 2749, 115 L.Ed.2d 929 (1991).

▮ The doctrine is available only for misleading "forward-looking" statements. It cannot be invoked for misleading statements of existing fact. *See In re Donald Trump Sec. Litig.,* 7 F.3d at 371; *Shaw v. Digital Equip. Corp.,* 82 F.3d 1194, 1213 (1st Cir. 1996); *Voit v. Wonderware Corp.,* 977 F.Supp. 363, 371–72 (E.D.Pa.1997).

In addition, the Securities Act, as amended, provides a "safe harbor" for forward look-

ing statements.[17] *See* 15 U.S.C. § 77z–2; 17 C.F.R. § 230.175. A forward looking statement is defined as:

(A) a statement containing a projection of revenues, income (including income loss), earnings (including earnings loss) per share, capital expenditures, dividends, capital structure, or other financial items;

(B) a statement of the plans and objectives of management for future operations, including plans or objectives relating to the products or services of the issuer;

(C) a statement of future economic performance, including any such statement contained in a discussion and analysis of financial condition by the management or in the results of operations included pursuant to the rules and regulations of the Commission;

(D) any statement of the assumptions underlying or relating to any statement described in subparagraph (A), (B), or (C);

(E) any report issued by an outside reviewer retained by an issuer, to the extent that the report assesses a forward-looking statement made by the issuer; or

(F) a statement containing a projection or estimate of such other items as may be specified by rule or regulation of the Commission.

15 U.S.C. § 77z–2(I)(1).

In any private action based upon a false statement of a material fact or omission of a material fact necessary to make a statement not misleading, no liability attaches with respect to any forward-looking statement, whether written or oral, if:

(A) the forward-looking statement is-

(i) identified as a forward-looking statement, and is accompanied by meaningful cautionary statements identifying important factors that could cause actual results to differ materially from those in the forward-looking statement; or

(ii) immaterial; or

(B) the plaintiff fails to prove that the forward-looking statement-

(i) if made by a natural person, was made with actual knowledge by that person that the statement was false or misleading; or

(ii) if made by a business entity; was-

(I) made by or with the approval of an executive officer of that entity, and

(II) made or approved by such officer with actual knowledge by that officer that the statement was false or misleading.

15 U.S.C. § 77z–2(c)(1).

■■■ Defendants rely upon the following cautionary statements to support their "bespeaks caution" and "safe harbor" defenses:

● "The success of any completed acquisition will depend on the Company's ability to integrate effectively the acquired businesses into the Company. The process of integrating acquired wireless communications businesses may involve *unforeseen difficulties* and may require a disproportionate amount of management attention and Company resources" (Compl.¶ 66(a)); and

● "The results of operations of wireless communications service providers such as the Company's are significantly affected by subscriber disconnections. . . . The Company's average monthly unit disconnect rate ("churn rate") during the nine months ended September 30, 1995, and the year ended 1994 were approximately 2.4% and 2.3%, respectively, of its subscriber base for each period. Although the Company's churn rate is below the industry average, there can be no assurance that the Company will not experience an increase in its churn rate which may adversely effect the Company's results of operations." (*Id.* ¶ 68).

Moving Brief at 9–10.

These statements, while relating directly to the issues upon which the Secondary Offering Plaintiffs claim the market relied, cannot serve as the basis for dismissal pursuant to Rule 12(b)(6). Viewing the facts in a light most favorable to the Secondary Offering Plaintiffs, the risk factors themselves were materially misleading.

---

**17.** This "safe harbor" is potentially available where, as here, the challenged statements were made by an issuer subject to the reporting requirements of Section 13(a) or Section 15(d) of the Exchange Act. *See* 15 U.S.C. § 77z–2(a).

■ Warnings of possible adverse events are insufficient to make omissions of present knowledge of certain future events legally immaterial. *See In re Westinghouse*, 90 F.3d at 709 ("[D]efendants' cautionary statements about the future did not render those misrepresentations of [known losses and known risks] immaterial."); *Rubinstein*, 20 F.3d at 171 ("to caution that it is only possible for the unfavorable events to happen when they have already occurred is deceit"). If the Secondary Offering Plaintiffs prove the allegations contained in the Amended Complaint, the Defendants could be found not to have hade a reasonable belief or foundation for the statements included in the risk factors. *See* Amended Complaint at ¶ 66(b) (alleging Defendants warned of possible integration difficulties at a time when they were already experiencing difficulty integrating Dial Page).

Were Secondary Offering Plaintiffs able to prove the allegations they set forth in the Amended Complaint, the statements Defendants argue are cautionary statements would themselves be misleading. Secondary Offering Plaintiffs argue MobileMedia attempted to warn of a mere contingency when it was aware the contingency had already occurred. *See* Opposition Brief at 25. Such warnings are not sufficient to warrant the application of the bespeaks caution doctrine or the safe harbor. *See In re Westinghouse*, 90 F.3d at 709.

■ The safe harbor of the Securities Act, 15 U.S.C. § 77z-2, however, reaches further than the bespeaks caution doctrine. Even in the absence of sufficient cautionary language, the safe harbor can prevent liability for forward looking statements from attaching if plaintiffs fail to prove individual defendants acted with actual knowledge of the falsity or underwriter defendants acted with the approval of an officer who had actual knowledge of the falsity. *See* 15 U.S.C. § 77z-2(c)(1)(B)(i), (ii)(I).

■ To fall within the safe harbor created by Section 77z-2, the alleged misrepresentation must be a forward looking statement. *See* 15 U.S.C. § 77z-2(a). In the instant matter, Secondary Offering Plaintiffs argue their Section 11 and Section 12(a)(2) claims are based upon omissions of existing facts and circumstances. *See* Opposition Brief at 26. Allegations based upon omissions of existing facts or circumstances do not constitute forward looking statements protected by the safe harbor of the Securities Act. *See In re ValuJet, Inc. Se. Litig.*, 984 F.Supp. 1472, 1479 (N.D.Ga.1997) (refusing to apply safe harbor because plaintiffs alleged failure to disclose existing facts); *Voit v. Wonderware Corp.*, 977 F.Supp. 363, 371 (E.D.Pa.1997); *cf. In re Trump*, 7 F.3d at 371-77 (applying bespeaks caution doctrine only to allegations of forward looking omissions, not to allegations concerning omissions of present fact).

The statement "[MobileMedia] believes the MobileComm acquisition will enhance it competitive position" is alleged to be misleading on the basis of omissions of facts known to MobileMedia at the time the statement was made. *See* Opposition Brief at 26. The safe harbor of the Securities Act does not insulate Defendants from liability for these omissions.[18]

### b. *The False FCC Forms 489*

Defendants raise three challenges to the allegations of the Secondary Offering Plaintiffs concerning the filing of False FCC Forms 489. First, Defendants argue the filing of false FCC Forms 489 did not become

---

**18.** Defendants mistakenly argue they are "entitled to the statutory safe harbor if 'the plaintiff fails to prove that the forward looking statement' was:

 (i) (with respect to the Individual Defendants) 'made with actual knowledge by that person that the statement was false or misleading;' or

 (ii) (with respect to the underwriters) 'made by or with the approval of an executive officer' of each of the four underwriters, and was also 'made or approved by such officer with actual knowledge by that officer that the statement was false or misleading.'

Moving Brief at 16-17 (quoting 15 U.S.C. § 77z-2(c)(1)(B)).

 Before deciding whether the safe harbor is available, it must first be determined there is a "forward looking statement," as defined by the Securities Act. Given the safe harbor has been found to be inapplicable to the allegations of omissions of present facts, the Secondary Offering Plaintiffs are not required to plead actual knowledge or executive approval.

widespread and systematic until the first quarter of 1996—several moths after the Secondary Offering. *See* Moving Brief at 18. Second, Defendants argue the filing of false FCC Forms 489 was not known or reasonably discoverable by the Defendants. *See id.* Third, Defendants argue the challenged statements fall within the safe-harbor for forward looking statements.

■ Section 11 and Section 12(a)(2) require a statement to be materially false or misleading at the time it was made for liability to attach. *See Trump,* 7 F.3d at 368. Therefore, if false Forms 489 were not filed until after the Secondary Offering then the allegations concerning the filing of false Forms 489 could not serve as the basis for Section 11 and Section 12(a)(2) liability.

■ In the instant matter, the Secondary Offering Plaintiffs have pleaded sufficient facts, when viewed in a light most favorable to them, to support the allegation false Forms 489 were filed before the Secondary Offering. Further, viewing the facts in a light most favorable to the Secondary Offering Plaintiffs, it appears a reasonable investor would find the failure to disclose this information was material to his or her decision.

The text of the 15 October 1996 Report contradicts the contention of the Defendants that significant violations of FCC licensing requirements did not occur until the first quarter of 1996. For example, the 15 October 1996 Report states:

- "[T]he Company decided to examine all of the Form 489 filings that it [had] made [since] October 11, 1993, the date on which MobileMedia was formed .... That review indicated that 49 out of a total of 245 Forms 489 filed prior to January 1, 1996 contained similar inaccuracies.[19] Similarly, 16 out of a total of 65 Forms 489 filed between March 31, 1996 and October 2, 1996 also contained such inaccuracies. *Given these findings, it is apparent that, although the total quantity and systematic nature of the inaccu-*

rate filings made in the first quarter of 1996 were aberrational, the practice of filing inaccurate Forms 489 was not." 15 October 1996 Report at 2 (emphasis added);

- "As the investigation demonstrated, regulatory Counsel had in fact *routinely* engaged in the practice of filing Forms 489 prior to construction both before and after the first quarter of 1996." *Id.* at 3 (emphasis added);

- "As [the] investigation revealed, the practice of 'filing first and building later' was not foreign to Regulatory Counsel, *who had utilized this same technique on a frequent, if less systematic basis, in the past." Id.* at 16 (emphasis added); and

- "This [report] is in no way intended to minimize or justify the *serious violations of law* and Commission policy, which occurred *in great number and over a long period of time.* Those derelictions are inexcusable and intolerable ..." *Id.* at 23 (emphasis added).

The 15 October 1996 Report, viewed in a light most favorable to the Secondary Offering Plaintiffs, supports the allegation the filing of false Forms 489 occurred before the Secondary Offering.

In the instant matter, the Amended Complaint alleges the following facts:

- MobileMedia, from its inception in 1993, engaged in a practice of filing false Form 489s with the FCC, pursuant to which the Company filed approximately 49 fraudulent Forms 489 between 11 October 1993 and the effective date of the offering. *See* Amended Complaint at ¶¶ 59–60, 62.

- MobileMedia's history of false filings during the pre–1996 period "would, if known or discovered by the FCC, be certain to result in the denial of renewal applications by the FCC *and would also create a substantial risk that other FCC licenses would be revoked, and that the Company would be disqualified from ob-*

19. All 49 of these pre–1996 false filings were submitted before the November 7, 1995 effective date. *See* 15 October 1996 Report at Exh. 19.

*taining licenses for additional frequencies ...*" Amended Complaint at ¶ 61 (emphasis added).

- The Prospectus represented that, *inter alia*, "the Company is unaware of any circumstance which would prevent the grant of pending or future renewal applications" and recited language from the Company's Credit Agreement warranting that the Company's operations "are ... in compliance with all terms and conditions of [its] FCC licenses," and that "[n]o event has occurred [that could] result in the imposition of a material forfeiture or the revocation, termination or adverse modification of any FCC license." Amended Complaint at ¶¶ 59, 63.

■ The failure of an offering document to disclose a company's violations of law provides a valid basis for asserting claims under Securities Act if the violations were material. *See, e.g., Craftmatic*, 890 F.2d at 628; *Westinghouse Electric Corp. v. Franklin*, 789 F.Supp. 1313, 1320 (D.N.J.1992), *rev'd on other grounds*, 993 F.2d 349 (3d Cir.1993); *Pearl v. Geriatric & Medical Centers, Inc.*, 1995 WL 243675, 1995 U.S. Dist. LEXIS 5475, at *5–6 (E.D.Pa. Apr. 19, 1995) (App. Exh. B); *S.E.C. v. Jos. Schlitz Brewing Co.*, 452 F.Supp. 824, 830 (E.D.Wis.1978).

■ Whether a company's undisclosed violations of law are material is governed by the standard set forth by the Supreme Court in *TSC Industries*, which provides that an omitted fact is material if there is a " 'substantial likelihood that, under all the circumstances, the omitted fact would have assumed actual significance in the deliberations of the reasonable shareholder.' " *Craftmatic*, 890 F.2d at 639 (quoting *TSC Industries v. Northway, Inc.*, 426 U.S. 438, 449, 96 S.Ct. 2126, 48 L.Ed.2d 757 (1976)). Consistent with this standard, the Circuit has stated, "a violation ... that is substantially likely to be significant to a reasonable investor is a fact that must be disclosed, even though the legal consequence of the violation may be a contingency." *Craftmatic*, 890 F.2d at 640 n. 16 (citations omitted; emphasis added).

"The Supreme Court[, however,] has been 'careful not to set too low a standard of materiality' in order to avoid 'an overabundance of information' especially concerning corporate developments of 'dubious significance.' " *Weiner*, 928 F.Supp. at 1384 (quoting *Lewis v. Chrysler Corp.*, 949 F.2d 644, 649 (3d Cir.1991)); *see Basic*, 485 U.S. at 231, 108 S.Ct. 978. The reason for this is that the Supreme Court

> was concerned that a minimal standard might bring an overabundance of information within its reach, and lead management 'simply to bury the shareholders in an avalanche of trivial information—a result that is hardly conducive to informed decisionmaking.'

*Basic*, 485 U.S. at 231, 108 S.Ct. 978 (quoting *TSC Indus., Inc. v. Northway, Inc.*, 426 U.S. 438, 448–49, 96 S.Ct. 2126, 48 L.Ed.2d 757 (1976)).

■ The issue of materiality is a mixed question of law and fact which ordinarily is decided by the trier of fact. *See Weiner*, 129 F.3d at 317; *In re Donald Trump Sec. Litig.*, 7 F.3d at 369 n. 13; *Shapiro*, 964 F.2d at 281 n. 11. If the alleged misrepresentations and omissions, however, are so obviously unimportant to an investor that reasonable minds cannot differ on the question of materiality, the allegations are not actionable as a matter of law. *See Weiner*, 129 F.3d at 317; *In re Westinghouse Sec. Litig.*, 90 F.3d at 707 n. 8; *In re Donald Trump Sec. Litig.*, 7 F.3d at 369 n. 13; *Shapiro*, 964 F.2d at 281 n. 11. When assessing materiality, not only the statement or omission itself but, as well, the context in which it occurs must be considered. *See In re Donald Trump Sec. Litig.*, 7 F.3d at 364 ("[A] statement or omission must be considered in context")

As in *Craftmatic*, the Secondary Offering Plaintiffs allege the Secondary Offering Prospectus contained affirmative representations which falsely assured investors MobileMedia was in compliance with applicable law. *See* 890 F.2d at 640. The fact MobileMedia could face serious legal consequences as a result of these alleged violations is information a reasonable investor would find important. *See id.* Accordingly, the Amended Complaint sufficiently alleges a basis for finding Section

11 and Section 12(a)(2) liability—the failure to disclose false filings of FCC Forms 489.

 Defendants argue the filing of false Forms 489 was not reasonably discoverable by them at the time of the Secondary Offering. *See* Moving Brief at 21–23. In support of this argument, Defendants contend the filing of false Forms 489, before the Secondary Offering, was the secret work of one individual. *See id.* at 22.

 "Individuals who sign the registration statement, directors of the issuer, and the underwriter of the securities ... are accorded a complete defense against civil liability based on the exercise of reasonable investigation and a reasonable belief that the registration statement was not misleading." *Hochfelder,* 425 U.S. at 208, 96 S.Ct. 1375.

The Amended Complaint, and the documents relied upon by the Secondary offering Plaintiffs in the Amended Complaint, however, provide sufficient allegations which, at the very least, support the conclusion whether the filing of false FCC Forms 489 was reasonably discoverable by the Defendants is a question of fact. The 15 October 1996 Report states during the course of the investigation remarks were made concerning the prevalence of false FCC filings in the mobile communications industry. *See* 15 October 1996 Report at 25. If this is proven at trial, it will support the conclusion Defendants either knew or should have known, through the exercise of due diligence, that MobileMedia had filed false Forms 489.

It would be premature to dismiss the claims of the Secondary Offering Plaintiffs on the grounds Defendants did not know of the false FCC filings. *See Hochfelder,* 425 U.S. at 209 n. 27, 96 S.Ct. 1375 (the seller has the burden of proving due diligence defense); *Eichenholtz v. Brennan,* 52 F.3d 478, 485 (3d Cir.1995) (same). As allegations of the Amended Complaint, if proved at trial, could lead to success on the merits, dismissal of the Section 11 and Section 12(a)(2) claims pursuant to Rule 12(b)(6) is inappropriate.

With the exception of the allegations found at paragraph 54 of the Amended Complaint, found to be inactionable puffery, Secondary Offering Plaintiffs have sufficiently stated claims pursuant to Section 11 and Section 12(a)(2). In support of the Section 11 claims, Secondary Offering Plaintiffs have alleged: (1) they purchased securities traceable to an effective registration statement, *see* Amended Complaint at ¶ 126; (2) the Defendants are of the class upon which the Securities Act imposes liability, *see id.* at ¶¶ 122–23; and (3) the Secondary Offering Registration Statement contained material misstatements at the time it became effective. *See id.* at ¶¶ 52–68, 119.

In support of the Section 12(a)(2) claims, Secondary Offering Plaintiffs have alleged: (1) the Defendants offered or sold securities to the Class, *see* Amended Complaint at ¶ 131; (2) the sale was made by means of a prospectus or oral communication, *see id.* at ¶¶ 131, 134; (3) the Secondary Offering Prospectus contained material misstatements or omissions, *see id.* at ¶¶ 52–68, 132; and (4) Secondary Offering Plaintiffs were unaware of the untruths or omissions when they purchased the securities. *See id.* at ¶ 134. These allegations, viewed in a light most favorable to the Secondary Offering Plaintiffs are sufficient to state claims under the Securities Act.

### 2. *Exchange Act Claims*

#### a. *Section 10(b) and Rule 10b–5*

Count IV of the Amended Complaint alleges violations of Section 10(b) and Rule 10b–5. *See* Amended Complaint at ¶¶ 144–58. Litigants are permitted to commence private rights of action determined to be implied by the terms of Section 10(b) of the Exchange Act. *See Central Bank of Denver,* 511 U.S. at 171, 114 S.Ct. 1439 (citing *Superintendent of Ins. of N.Y. v. Bankers Life & Casualty Co.,* 404 U.S. 6, 13, n. 9, 92 S.Ct. 165, 30 L.Ed.2d 128 (1971) (citing Section 10(b))); *Westinghouse Elec. Corp. v. B.H. Franklin,* 993 F.2d 349, 351 (3d Cir.1993).

Through Section 10(b), Congress prohibits manipulative or deceptive acts in connection with the purchase or sale of securities. Section 10(b) states:

It shall be unlawful for any person, directly or indirectly, by the use of any means or instrumentality of interstate commerce or

of the mails, or of any facility of any national securities exchange-

. . . .

(b) To use or employ, in connection with the purchase or sale of any security registered on a national securities exchange or any security not so registered, any manipulative or deceptive device or contrivance in contravention of such rules and regulations as the [SEC] may prescribe.

15 U.S.C. § 78j.

Rule 10b–5, adopted by the SEC in 1942, similarly outlaws such fraudulent conduct in connection with the purchase or sale of a security. Rule 10b–5 states:

It shall be unlawful for any person, directly or indirectly, by the use of any means or instrumentality of interstate commerce, or of the mails or of any facility of any national securities exchange,

(a) To employ any device, scheme, or artifice to defraud,

(b) To make any untrue statement of a material fact or to omit to state a material fact necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading, or

(c) To engage in any act, practice, or course of business which operates or would operate as a fraud or deceit upon any person,

in connection with the purchase or sale of any security.

17 C.F.R. § 240.10b–5 (1993).

To establish a claim under Section 10(b) and Rule 10b–5, a plaintiff must plead: (1) a false representation of a material fact; (2) knowledge or reckless disregard of its falsity by a defendant and his or her intention plaintiff rely on the falsity; (3) reasonable reliance thereon by the plaintiff; and (4) a resultant loss. *See Newton v. Merrill, Lynch, Pierce, Fenner & Smith, Inc.,* 135 F.3d 266, 269 (3d Cir.1998); *Kline v. First Western Gov't Sec., Inc.,* 24 F.3d 480, 487 (3d Cir.), *cert. denied,* 513 U.S. 1032, 115 S.Ct.

613, 130 L.Ed.2d 522 (1994); *Hayes v. Gross,* 982 F.2d 104, 106 (3d Cir.1992) (citation omitted); *Shapiro,* 964 F.2d at 280; *Lewis v. Chrysler Corp.,* 949 F.2d 644, 649 (3d Cir. 1991) (citation omitted); *In re Phillips Petroleum Sec. Litig.,* 881 F.2d 1236, 1244 (3d Cir.1989); *Zlotnick,* 836 F.2d at 821 (citing *Peil v. Speiser,* 806 F.2d 1154, 1160 & n. 9 (3d Cir.1986) (citing *Eisenberg v. Gagnon,* 766 F.2d 770, 785 (3d Cir.), *cert. denied sub nom. Wasserstrom v. Eisenberg,* 474 U.S. 946, 106 S.Ct. 342, 88 L.Ed.2d 290 (1985))).

The reliance of a plaintiff on alleged misstatements or omissions must be reasonable, even though the burden of proof is upon the defendant to show reliance was not reasonable. *See Kline,* 24 F.3d at 493 (citing *Straub v. Vaisman & Co.,* 540 F.2d 591, 598 (1976)). Where the security involved is traded in an open and efficient market,[20] a plaintiff need not show individual and specific reliance on the misrepresentation of a defendant; a plaintiff may instead rely upon the fraud on the market theory and claim only that he or she suffered injury in the capacity as a purchaser or seller of a security in such a market. *See Hayes,* 982 F.2d at 106; *Cammer v. Bloom,* 711 F.Supp. 1264, 1276 (D.N.J.1989).

In *Peil,* the Third Circuit held a showing of a fraud on the market may result in a rebuttable presumption of reliance by a plaintiff who purchases a security in an open and developed market. *See* 806 F.2d at 1161; *see also Zlotnick,* 836 F.2d at 821. Where a purchaser of a stock establishes he or she made the purchase in an " 'open and developed market' " and the defendant had made a material misrepresentation, it " 'will [be] presume[d] that the misrepresentations occasioned an increase in the stock's value that, in turn, induced the plaintiffs to purchase the stock.' " *Zlotnick,* 836 F.2d at 821 (quoting *Peil,* 806 F.2d at 1161).

Because a Rule 10b–5 claim is a "fraud" claim, the Section 10(b) Plaintiffs must satisfy the pleading requirements of

---

**20.** " 'The fraud on the market theory is based on the hypothesis that, in an open and developed securities market, the price of a company's stock is determined by the available material information regarding the company and its business.' " *See Cammer,* 711 F.Supp. at 1276 (quoting *Basic v. Levinson,* 485 U.S. 224, 108 S.Ct. 978, 99 L.Ed.2d 194 (1988)).

Rule 9(b). *See In re Burlington Coat Factory Sec. Litig.*, 114 F.3d at 1417; *In Re Westinghouse Sec. Litig.*, 90 F.3d at 710; *Wallace*, 1997 WL 602808, at *8. Rule 9(b) requires that "[i]n all averments of fraud or mistake, the circumstances constituting fraud or mistake shall be stated with particularity." Fed. R.Civ.P. 9(b). The purpose of the heightened pleading requirement is to give defendants "notice of the claims against them, provides an increased measure of protection for their reputations, and reduces the number of frivolous suits brought solely to extract settlements." *In re Burlington Coat Factory Sec. Litig.*, 114 F.3d at 1418.

■ In order to satisfy Rule 9(b) in connection with a Rule 10b–5 claim, a plaintiff must plead with particularity (1) a specific misrepresentation of material fact; (2) the knowledge by defendants of its falsity; (3) the ignorance by the plaintiff of its falsity; (4) the intention of defendants that it should be acted upon; and (5) that plaintiff acted upon it to his detriment. *See In re Westinghouse Sec. Litig.*, 90 F.3d at 710; *Shapiro*, 964 F.2d at 284.

Consequently, Rule 9(b) demands increased specificity in the pleadings to establish violations of Section 10(b) and Rule 10b–5.[21] Pursuant to Rule 9(b), allegations concerning misrepresentations of material fact must be pleaded in greater detail. *See, e.g., In re Burlington Coat Factory Sec. Litig.*, 114 F.3d at 1417–18 (Rule 9(b) requires "where plaintiffs allege that defendants distorted certain data disclosed to the public by using unreasonable accounting practices, ... plaintiffs [must] state what the unreasonable practices were and how they distorted the disclosed data"); *Shapiro*, 964 F.2d at 285 (citing *Craftmatic Sec. Litig. v. Kraftsow*, 890 F.2d 628, 646 (3d Cir.1989))(Rule 9(b) requires plaintiffs to "accompany the allegations with a statement of fact upon which their allegation is based").

■ The particularity requirement of Rule 9(b) is "relaxed somewhat where the factual information is peculiarly within the defendant's knowledge or control." *See In re Burlington Coat Factory Sec. Litig.*, 114 F.3d at 1418; *Shapiro*, 964 F.2d at 285; *Craftmatic Sec. Litig.*, 890 F.2d at 645. This is so because application of the particularity requirement "may permit sophisticated defrauders to successfully conceal the details of their fraud." *In re Burlington Coat Factory Sec. Litig.*, 114 F.3d at 1418; *see Craftmatic*, 890 F.2d at 645; *Christidis v. First Pa. Mort. Trust*, 717 F.2d 96, 100 (3d Cir.1983).

■ Even under a relaxed application of Rule 9(b), "boilerplate and conclusory allegations will not suffice." *In re Burlington Coat Factory Sec. Litig.*, 114 F.3d at 1418; *see Shapiro*, 964 F.2d at 285. Instead, "[p]laintiffs must accompany their legal theory with factual allegations that make their theoretically viable claim plausible." *In re Burlington Coat Factory Sec. Litig.*, 114 F.3d at 1418; *see Shapiro*, 964 F.2d at 285; *Craftmatic*, 890 F.2d at 645. Defendants Bayer and McVay argue Count Four of the Amend-

---

**21.** The Private Securities Litigation Reform Act of 1995, (the "Reform Act") adopts this heightened pleading requirement for private securities litigation. *See* 15 U.S.C. § 78u–4(b)(1)(B)("[T]he complaint shall specify each statement alleged to have been misleading, the reason or reasons why the statement is misleading and, if an allegation regarding the statement or omission is made on information and belief, the complaint shall state with particularity all facts on which the belief is formed."). It has been held that the pleading requirements under the Reform Act place an "additional burden on plaintiffs attempting to plead fraud in securities cases." *Rosenbaum & Co. v. H.J. Myers & Co.*, No. 97–824, 1997 WL 689288, at *2 (E.D.Pa. Oct.9, 1997).

The Reform Act was enacted in December 1995 in an effort by Congress to curtail perceived abuses in private securities litigation. "Congress has been prompted ... to enact reforms to pro-

tect investors and maintain confidence in our capital markets. The House and Senate Committees heard evidence that abusive practices committed in private securities litigation include: (1) the routine filing of lawsuits against issuers of securities and others whenever there is a significant change in an issuer's stock price, without regard to any underlying culpability of the issuer, and with only faint hope that the discovery process might lead eventually to some plausible cause of action; (2) the targeting of deep pocket defendants, including accountants, underwriters, and individuals who may be covered by insurance, without regard to their actual culpability...." *See* H.R. Conf. Rep. No. 104–369, 104th Cong., 1st Sess. 31,32 (1995)(the "Conference Report").

Together, Rule 9(b) and 15 U.S.C. § 78u–4(b) require a plaintiff to state with particularity the circumstances surrounding the alleged fraud.

ed Complaint, alleging liability pursuant to Rule 10b–5, fails to state a claim as to them.

### 1. *Bayer*

■ Bayer argues the Section 10(b) Plaintiffs have not alleged sufficient facts to support the conclusion he knew of, or recklessly disregarded, the filing of false Forms 489 before 19 August 1996. *See* Moving Brief at 28–29. Bayer further argues the Section 10(b) Plaintiffs have not alleged sufficient facts to support the conclusion he knew or recklessly disregarded the integration problems of MobileMedia before June of 1996. *See id.* at 31–32.

■ A viable claim under Section 10(b) and Rule 10b–5 requires the plaintiff to plead scienter. Rule 9(b), however, states "[m]alice, intent, knowledge, and other condition of mind of a person may be averred generally." *See* F.R. Civ. P. 9(b). This Circuit has interpreted this provision to mean

> [w]hile state of mind may be averred generally, plaintiffs must still allege facts that show the court their basis for inferring that the defendants acted with "scienter." Otherwise, strike suits based on no more than plaintiffs' detection of a few negligently made errors in company documents or statements (errors detected in the aftermath of a stock price drop) could survive the pleading threshold and subject public companies to unneeded litigation expenditures.

*See In re Burlington Coat Factory Sec. Litig.,* 114 F.3d at 1418; *see also In Re Westinghouse Sec. Litig.,* 90 F.3d at 711.[22] "The requisite 'strong inference' of fraud may be established either (a) by alleging facts to show that defendants had both motive and opportunity to commit fraud, or (b) by alleging facts that constitute strong circumstantial evidence of conscious misbehavior or recklessness." *In re Burlington Coat Factory Sec. Litig.,* 114 F.3d at 1418, 1422.

The pleading standard for scienter under the Reform Act also is relevant to this analysis. In formulating a heightened pleading standard for scienter for claims under Section 10(b) and Rule 10b–5, Congress recognized that Rule 9(b) "has not prevented abuse of the security laws by private litigants" in part because "the courts of appeal have interpreted Rule 9(b)'s requirement in conflicting ways, creating distinctly different standards [for scienter] among the circuits." *See* Conference Report. Congress envisioned a more uniform pleading standard which would "curtail the filing of meritless lawsuits." *See id.*

The Reform Act added § 21D, 15 U.S.C. § 78u–4, ("Section 21D") to the Securities Exchange Act of 1934 (the "Exchange Act"). Section 21D(b)(2) provides, in relevant part:

> [T]he complaint shall, with respect to each act or omission alleged to violate this title, state with particularity facts giving rise to a *strong inference* that the defendant acted with the required state of mind.

*See* 15 U.S.C. § 78u–4(b)(2) (emphasis added).

Bayer is not charged by the Section 10(b) Plaintiffs with any wrongdoing pre-dating the 15 July 1996 Press Release. *See* Opposition Brief at 26. Further, the allegations that Bayer, as of June 1996 believed "the business was spinning badly out of control" and that "the consolidation of Dial Page was a functional disaster", *see* Opposition Brief at 28 (citing testimony of Bayer before the FCC), are sufficient to "satisfy the scienter requirement... that [Bayer] knew or was reckless in not knowing" his statements were misleading. *In re Burlington Coat Factory,* 114 F.3d at 1422.

■ Bayer next argues he was under no obligation to correct statements made by or on behalf of MobileMedia before 27 September 1997 concerning the filing of false Forms 489.[23] *See* Moving Brief at 30. Bayer con-

---

22. As discussed below, a plaintiff who commences an action for securities fraud after the enactment date of the Reform Act must also satisfy the heightened pleading standard for scienter. The Reform Act provides, in relevant part, "[t]he complaint shall with respect to each act or omission ... state with particularity facts

giving rise to a strong inference that the defendant acted with the required state of mind." 15 U.S.C. § 78u–4(b)(2).

23. Bayer further argues he was under no duty to disclose the false FCC filings after 4 September 1996, because that is the day he stepped down as

tends he first learned of the false FCC filings on 9 August 1996. *See id.* at 31. Bayer further contends on that same day he notified the Board of Directors and hired outside counsel to conduct an investigation. *See id.*

Bayer argues the investigation was not substantially completed until 26 September 1997. *See* Moving Brief at 30. The next day, MobileMedia issued a press release disclosing the false FCC filings. *See id.* Bayer, therefore, argues he fulfilled his disclosure obligations under Federal securities law. *See id.* Bayer contends he was under no obligation to disclose the false FCC filings until the investigation was substantially complete.

■■■■ If a statement made by or on behalf of a corporation is later found to be misleading, the corporation must correct the statement within a reasonable period of time. *See Weiner,* 129 F.3d at 315 ("[T]here can be no doubt that a duty exists to correct prior statements, if the prior statements were true when made but misleading if left unrevised."); *In re Burlington Coat Factory,* 114 F.3d at 1430. Corporate officers, however, have the obligation to be certain the recently discovered adverse facts are accurate before making a corrective disclosure. *See Acito v. IMCERA Group, Inc.,* 47 F.3d 47, 52–53 (2d Cir.1995); *Zucker,* 891 F.Supp. at 1015–16. Whether a corrective statement is sufficiently prompt is a question "that must be determined in each case based upon the particular facts and circumstances." *See Weiner,* 129 F.3d at 316.

In the instant matter, the facts and circumstances, viewed in a light most favorable to the Section 10(b) Plaintiffs, support the conclusion a duty to correct previous statements arose as early as 4 September 1996. On 4 September 1996, it appears the investigation of outside counsel was sufficiently

complete to warrant informing the FCC of possible regulatory violations. *See* 15 October 1996 Report at 1. The Section 10(b) Plaintiffs have pleaded sufficient facts to support the allegation Bayer was sufficiently sure of the facts and materiality of the false FCC filings made by MobileMedia to warrant public disclosure prior to the close of the Class Period on 27 September 1996.

■■ Lastly, Bayer argues the 15 July 1996 Press · Release and the 25 July 1996 Press Release were not materially misleading. "A statement is false or misleading if it is factually inaccurate, or additional information is required to clarify it." *Wallace v. Systems & Computer Tech. Corp.,* No. 95–6303, 1997 WL 602808, at \*9 (E.D.Pa. Sept.23, 1997); *see In re Bell Atlantic Corp. Sec. Lit.,* No. 91–0514, 1997 WL 205709, at \*23 (E.D.Pa. Apr.17, 1997); *Pache v. Wallace,* No. 93–5164, 1995 WL 118457, at \*3 (E.D.Pa. Mar.20, 1995), *aff'd,* 72 F.3d 123 (3d Cir.1995).

■■ Misleading statements of intentions or forward looking statements, such as projections, estimates, and forecasts may be actionable if "[they] are issued without reasonable genuine belief [in their accuracy or truth] or if [they] ha[ve] no basis." *Kline v. First W. Gov't Sec., Inc.,* 24 F.3d 480, 486 (3d Cir.1994); *see also In re Donald Trump Sec. Litig.,* 7 F.3d at 368; *In re Bell Atlantic Corp. Sec. Lit.,* 1997 WL 205709, at \*23.

■■ In order to determine whether a forward looking statement can be deemed false or misleading, "the court must examine whether the speaker, at the time it is made, (1) actually believed the statement to be accurate, or whether (2) there is a factual or historical basis for that belief." *In re Bell Atlantic Corp. Sec. Lit.,* 1997 WL 205709, at \*23; *see Kline,* 24 F.3d at 486. It is not

Interim CEO. *See* Reply Brief at 8. Bayer argues "Plaintiffs concede that their § 10(b) and § 20(a) claims against Bayer relate *only* to the limited time he served as Interim CEO—July 15 to August 30, 1996." *See id.* (citing Opposition Brief at 26–27).

No such concession is to be found at pages 26 to 27 of the Opposition. *See* Opposition Brief at 26–27. Rather, Section 10(b) Plaintiffs state they do not charge Bayer with any wrongdoing pre-

dating the 15 July 1996 Press Release. *See id.* (citing Amended Complaint at ¶151). Paragraph 151 of the Amended Complaint alleges Bayer, in addition to being named Interim CEO, served as Chairman of the Board of Directors from 15 July 1996 until the end of the Class Period. As Chairman of the Board, Bayer retained his duty to correct the earlier statements of MobileMedia.

enough, however, that a statement is false or misleading; if the misrepresented fact is not material, then the misrepresented fact is not actionable. *See Basic, Inc. v. Levinson,* 485 U.S. 224, 238, 108 S.Ct. 978, 99 L.Ed.2d 194 (1988); *Weiner,* 928 F.Supp. at 1384.

■ A misleading statement or omission is material if there is a substantial likelihood that the reasonable investor would have viewed the statement or omission "as having significantly altered the 'total mix' of information made available." *Basic,* 485 U.S. at 231, 108 S.Ct. 978; *see Weiner,* 129 F.3d at 317; *Shapiro,* 964 F.2d at 281 n. 11.

The 15 July 1996 Press Release stated, in relevant part:

> We will ensure that we continue to provide our customers with the best and most reliable service. In that regard, we will continue to pursue [MobileMedia's] Strategy of strengthening and extending its market leadership and competitive position. We will do this by accommodating our growing subscriber base through our broad base of spectrum resources; expanding sales coverage to new geographic regions and increasing distribution channel penetration; developing strategic marketing alliances to access new distribution channels and demographic groups; and building critical mass to establish competitively advantageous economies of scale.

15 July 1996 Press Release.

■ Contrary to the contention of the Section 10(b) Plaintiffs, *see* Opposition Brief at 28–29, the statement "We will ensure that we continue to provide our customers with the best and most reliable service" is forward looking in nature. The statement MobileMedia will continue to provide the best in customer service is the type of puffery that has been found to be immaterial as a matter of law. *See, e.g., In re Burlington Coat Factory,* 114 F.3d at 1427 (finding statement that "company believed it could continue to grow net earnings at a faster rate than sales" to be inactionable puffery); *Shaw v. Digital Equipment Corp.,* 82 F.3d 1194, 1217 (1st Cir.1996) ("[C]ourts have demonstrated a willingness to find immaterial as a matter of law certain kind of rosy affirmation common-

ly heard from corporate managers and numbingly familiar to the marketplace—loosely optimistic statements that are so vague ... that no reasonable investor could find them important in the total mix of information available.").

This portion of the 15 July 1996, claiming MobileMedia will provide the best service to its customers, is not the type of information the ordinary investor would be likely to find important to his or her investment decision. Accordingly, this statement is immaterial even if, as Section 10(b) Plaintiffs contend, it was made without a reasonable basis. This type of puffery cannot serve as the basis for liability under Federal securities law. *See In re Burlington Coat Factory,* 114 F.3d at 1427.

■ The 25 July 1996 Press Release states, in relevant part:

> The wireless messaging industry continues to grow at a strong pace, and MobileMedia continues to capture a large share of that growth. In addition, [MobileMedia] continue[s] to make good progress in working through the challenges involved with integrating our acquisition of MobileComm, and expect to have the integration completed within our planned 18–month time frame.

25 July 1996 Press Release.

Bayer argues this statement is not materially misleading when viewed in conjunction with previous public disclosures. *See* Moving Brief at 34. Specifically, Bayer cites to the 6 June 1996 Press Release which stated integration efforts would continue into the first half of 1997 and would require MobileMedia:

> "(I) to incur costs associated with the migration of units-in-service between paging networks to rationalize capacity usage, (ii) to carry redundant costs from the temporary operation of duplicative functions and (iii) to incur costs associated with hiring employees to focus on the integration of sales, customer support, inventory management and logistics functions."

*Id.* (quoting 6 June 1996 Press Release).

Bayer argues that in light of the 6 June 1996 Press release, the statement "[MobileMedia] continue[s] to make good progress"

can only be interpreted as an acknowledgment Mobile had problems, but was making good progress working through them. *See* Moving Brief at 35. When the Amended Complaint is viewed in a light most favorable to the Section 10(b) Plaintiffs, the allegations support the inference Bayer could not have believed MobileMedia was making good progress. *See* Amended Complaint at ¶¶ 87–89 (alleging Bayer was aware the consolidation of Dial Page and MobileComm was a "functional disaster" and that the business was "spinning badly out of control"). Accordingly, viewing the 25 July 1996 Press Release in conjunction with the 6 June 1996 Press Release does not warrant dismissal of the Rule 10b–5 claims based upon statements made in the 25 July 1996 Press Release. *See In re Craftmatic*, 890 F.2d at 640 (defendant may be liable for material misstatements or omissions made without a reasonable basis).

### 2. *McVay*

 McVay argues the only alleged misstatement attributable to him was contained in the 1996 Form 8–K. *See* Moving Brief at 24–25. McVay further argues this statement was an accurate report of a corporate event which cannot serve as the foundation for liability pursuant to the Exchange Act.[24] *See id.*

Plaintiffs allege that by signing the 1996 Form 8–K, McVay affirmed MobileMedia was in compliance with the terms of the Credit Agreement. *See* Opposition Brief at 37. Plaintiffs further allege the failure of McVay to disclose the false FCC filings submitted by MobileMedia caused the quoted terms of the Credit Agreement to be materially misleading. *See id.* at 37–39.

The quotations from the Credit Agreement were included as part of Item 5 of the 1996 Form 8–K. *See* 1996 Form 8–K. Item 5 is designated as the space where events "the registrant deems of importance to security holders" are to be reported. *See Information to be Included in the [8–K] Report*, 5 Fed.Sec.L.Rep. (CCH) ¶ 31,003 at 21,992.

The Credit Agreement provided funds for the acquisition of MobileComm. *See* Amended Complaint at ¶ 63. The terms of the agreement, as quoted in the 1996 Form 8–K, required MobileMedia to be in compliance with all FCC rules and regulations. *See id.* (quoting 1996 Form 8–K).

As Defendants point out, the 1996 Form 8–K accurately delineates the terms of the Credit Agreement. *See* Moving Brief at 25–26. MobileMedia, however, does not have license to accurately report certain facts while omitting facts which would make the stated facts not misleading. *See, e.g., Virginia Bankshares*, 501 U.S. at 1098 n. 7, 111 S.Ct. 2749 (once statements are made there is an obligation not to mislead;) *Weiner*, 129 F.3d at 315–16 (there is a duty to correct true statements when they would be misleading if left unrevised); *Kline*, 24 F.3d at 491 (there is a general obligation to speak truthfully). Given the central role the Credit Agreement played in funding the acquisition of MobileComm, facts demonstrating MobileMedia was not in compliance with the terms of the Credit Agreement from the moment it was signed would be important to a reasonable investor.[25] *See, e.g., In re Westinghouse*, 90 F.3d at 709–10 (a reasonable investor would be interested in knowing facts which suggested the potential for future losses).

---

24. McVay further argues even though he signed the July 1996 Form 8–K, the July 1996 Form 8–K does not constitute a statement for which he is responsible. *See* Moving Brief at 26 & n. 10 (citing *S.E.C. v. Falstaff Brewing Corp.*, 629 F.2d 62, 70 n. 9 (D.C.Cir.1980)). This argument is without support. The case cited by McVay specifically held an individual defendant liable for omissions in a Form 8–K based upon his participation in its creation and filing. *See Falstaff*, 629 F.2d at 72.

25. McVay argues the 1996 Form 8–K cannot be construed as an affirmative statement MobileMe-

dia was in compliance with FCC regulations. *See* Moving Brief at 26. Even if this were true, however, the inclusion of the terms of the Credit Agreement in the Form 8–K, stood as a tacit representation MobileMedia was in compliance with those terms. *See* Amended Complaint at ¶ 101. The omission of facts concerning noncompliance with FCC rules and regulations is conceivably a material omission because it placed MobileMedia in default of a substantial credit agreement. The filing of false Forms 489 has a significance in this context independent of actions that might have been taken by the FCC.

By signing the 1996 Form 8–K, McVay had an obligation not to mislead. *See Weiner,* 129 F.3d at 315–16; *see also Santa Fe Indus.,* 430 U.S. at 477, 97 S.Ct. 1292 (the purpose of the Exchange Act was "to substitute a policy of full disclosure for the philosophy of caveat emptor."). The allegation McVay failed to disclose information known to him concerning the filing of false Forms 489 supports the inference the inclusion of the Credit Agreement in the 1996 Form 8–K was materially misleading in violation of Rule 10b–5.

With the exception of the allegations found at paragraphs 90 to 92 of the Amended Complaint, found to be inactionable puffery, the Section 10(b) Plaintiffs have sufficiently stated claims pursuant to Section 10(b) and Rule 10b–5. In support of the Section 10(b) claims, the Section 10(b) Plaintiffs have alleged: (1) false misrepresentations of material fact, *see* Amended Complaint at ¶¶ 42–46, 52–68, 75, 77–84, 86–94; (2) knowledge or reckless disregard of its falsity by a defendant and his or her intention plaintiff rely on the falsity, *see id.* at ¶¶ 146–152, 153–56; and (3) reasonable reliance thereon by the plaintiff (through the fraud on the market theory), *see id.* at ¶¶ 17, 19(f), 34, 153, 157; and (4) resultant loss. *See id.* at ¶ 158.

### 3. *The Control Person Claims*

■ Section 15 of the Securities Act and Section 20 of the Exchange provide for secondary liability of "control persons." To state a cause of action for control person liability, a plaintiff must allege a primary violation of Federal securities laws and "circumstances establishing control" of a primary violator of those laws. *Derensis v. Coopers & Lybrand Chartered Accountants,* 930 F.Supp. 1003, 1013 (D.N.J.1996).

■ To establish a defendant is control person, a plaintiff must demonstrate "the defendant had actual power or influence over the allegedly controlled person." *See Kersh v. General Council of Assemblies of God,* 804 F.2d 546, 548 (9th Cir.1986). Bayer alleges he did not become a control person until 15 July 1996. *See* Moving Brief at 41.

■ On 15 July 1996 Bayer became Chairman of the Board and interim CEO of MobileMedia. *See* 15 July 1996 Press Release. Before 15 July 1996, Bayer argues he was an outside director, who did not participate in the daily operations of management of MobileMedia. *See id.* at 41–42. (citing *In re Gupta Corp. Sec. Litig.,* 900 F.Supp. 1217, 1243 (N.D.Cal.1994) ("[S]tatus ... as an outside director is insufficient to make [defendant] control person.")).

Plaintiffs, however, allege Bayer was a controlling person, under both Section 15 of the Securities Act and Section 20 of the Exchange Act, because as a director Bayer had, and exercised, the power to influence and control MobileMedia. *See* Amended Complaint at 16. Plaintiffs have sufficiently pleaded the status of Bayer as a control person.[26] Challenges to the status of Bayer, given the Amended Complaint must be viewed in a light most favorable to the Section 10(b) Plaintiffs, represent questions of fact that are not properly resolved at this stage.

■ In addition to control, culpable participation must be proved before control person liability for misrepresentations attaches. *See Rochez Bros., Inc. v. Rhoades,* 527 F.2d 880, 890 (3d Cir.1975). The control person liability provision of the Securities Act and the Exchange Act were not intended to make control persons insurers against the fraudulent activities of others. *See Rochez*

**26.** Bayer also argues that no primary violation of the securities laws took place during his tenure as a control person. *See* Moving Brief at 43. It has been determined, however, the Amended Complaint sufficiently alleges Bayer was a control person throughout the Class Period. Accordingly Bayer is potentially liable as a control person for the alleged violations of Section 11 and Section 12(a)(2) of the Securities Act. In addition, it has been determined the alleged Rule 10b–5 violation for the 25 July 1996 Press Release survives the Motion to Dismiss. There are, therefore potential violations of the Exchange Act which occurred while Bayer was a control person. In addition, it has been found sufficient facts have been pleaded to support the inference MobileMedia had a duty to correct earlier statements concerning compliance with FCC violations as early as 4 September 1996. This also could lead to a finding of primary violations of the securities laws that occurred while Bayer was a control person.

*Bros.*, 527 F.2d at 890. Once a plaintiff establishes a prima facie case for control person liability, however, the burden shifts to the defendants to prove lack of culpable participation or knowledge. *See Maher v. Durango Metals, Inc.*, 144 F.3d 1302, 1304 (10th Cir.1998); *see also In re Craftmatic*, 890 F.2d at 644–45 (relaxing Rule 9(b) pleading requirements where facts supporting fraud are uniquely within the control of the defendant); *Wool v. Tandem Computers, Inc.*, 818 F.2d 1433 (9th Cir.1987) (general allegation culpable participation against corporate control persons satisfy Rule 9(b)); *Easton v. Mutual Benefit Life Ins. Co.*, 1992 WL 136857 (D.N.J.29 March 1992) (noting growing trend requires plaintiffs to plead only the circumstances establishing control).

The Secondary Offering Plaintiffs have sufficiently pleaded Rorke, Kealey, Pittsman, Bayer, Bunce, Cohen and Friedman were control persons potentially subject to liability under Section 15 of the Securities Act. *See* Amended Complaint at ¶¶ 20–24, 26 (alleging each was in a position of control and that each exercised control over MobileMedia). The Section 10(b) Plaintiffs have adequately pleaded Rorke, Kealey, Pittsman and Bayer were in a position to, and in fact did, control MobileMedia by means of their senior position within the corporation. *See* Amended Complaint at ¶¶ 20–24. In addition, the Amended Complaint has sufficiently alleged primary violations of the Securities Act and the Exchange Act. *See* Amended Complaint Counts One, Two and Four. These allegations are sufficient to state a claim for control person liability.

### 4. *Statute of Limitations Defense of McVay*

■ A claim for a violation of § 10(b) and Rule 10b–5 of the Exchange Act must be brought "within three years of the alleged violation and within one year of 'discovery of the facts constituting the violation.'" *In re Prudential Ins. Co. of Amer. Sales Prac. Litig.*, 975 F.Supp. 584, 598 (D.N.J.1996) (citing *Lampf, Pleva, Lipkind, Prupis & Petigrow v. Gilbertson*, 501 U.S. 350, 363, 111 S.Ct. 2773, 115 L.Ed.2d 321 (1991)); *see In re Data Access Systems Sec. Litig.*, 843 F.2d 1537, 1550 (3d Cir.1988). Although the Third Circuit has not determined whether the one-year period begins to run upon plaintiffs' actual notice of his claim or upon inquiry notice, "the courts of this district have clearly adopted the inquiry notice standard." *Prudential Sales*, 975 F.Supp. at 599 (citing *Rolo v. City Investing Co. Liquidating Trust*, 845 F.Supp. 182, 243 (D.N.J.1993)). Accordingly, the one year period runs from the date plaintiffs were on inquiry notice of the claims against defendant McVay.

■ "The facts constituting [inquiry] notice must be sufficiently probative of fraud— sufficiently advanced beyond the stage of mere suspicion, sufficiently confirmed or substantiated—not only to incite the victim to investigate but also to enable hi to tie up any loose ends and complete the investigation in time to file a timely suit." *Fujisawa Pharm. Co. v. Kapoor*, 115 F.3d 1332, 1333 (7th Cir. 1997). Dismissal pursuant to Rule 12(b)(6) based upon the running of the statute of limitations is often inappropriate. *See Rycoline Products, Inc. v. C & W Unlimited*, 109 F.3d 883, (3d Cir.1997) ("[I]f a statute of limitations bar is not apparent on the face of the complaint, then it may not serve as the basis for a dismissal of the complaint under Rule 12(b)(6)").

■ From the face of the Amended Complaint, it is not possible to conclude the claims against McVay are time barred. The Section 10(b) Plaintiffs argue there was no way for them to know at the time of the filing of the July Form 8–K that McVay was a party to the fraud. *See* Opposition Brief at 44. The Section 10(b) Plaintiffs further argue their efforts at discovery were hindered. *See id.* at 42 (noting Section 10(b) Plaintiffs were unable to obtain a copy of the 15 October 1996 Report until almost a year after it was turned over to the FCC); *id.* at 42 n. 11 (Order of the Bankruptcy Court, on 18 June 1997, prevented parties in this action from adding and dropping parties until the order was modified on 31 October 1997). Accordingly, the circumstances of the present case demonstrate it would not be proper, on a motion to dismiss, to decide if the statute of limitations had run prior to the addition of McVay as a defendant on 24 November 1997.

*Conclusion*

For the reasons stated, the Motion to Dismiss is granted to the extent the Plaintiffs rely upon the allegations of paragraphs 54 and 90 to 92 of the Amended Complaint. In all other respects, the Motion to Dismiss is denied.